JUDGES: Hon. Carol Ann Robb, Hon. Gene Donofrio, Hon. Mary DeGenaro
OPINION
ROBB, P.J.
{¶ 1} Defendants-Appellants Beck Energy Corporation et al. appeals the decision of the Monroe County Common Pleas Court entered in favor of Plaintiffs-Appellees John T. Paulus et al. Appellant first contends the lease was held by production and was still in its ten-year primary term, a period during which production in paying quantities was not required. Appellant claims a lessor whose lease is in its primary term cannot assert a lack of paying quantities, framing the issue as a lack of "standing" and claiming it is a jurisdictional issue which can be raised at any time *77 during the proceedings. Conversely, the issue is not one of subject matter jurisdiction. Furthermore, the primary term was amended to five years by a letter agreement and the parties proceeded through trial as if the only issue was whether the lease was producing in paying quantities. Appellant's reply brief asserts the letter agreement was barred by the parol evidence rule. However, Appellant essentially introduced the agreement into evidence and invited the trial court to proceed under the belief the primary term of the lease was five years due to an amendment.
{¶ 2} Next, Appellant argues the evidence established the well was producing in paying quantities. The parties presented various arguments, including whether the amount paid to replace a pump in 2013 should be considered an operating expense or an excludable "reworking" expense, whether royalties are operating expenses, whether the lessee's judgment on paying quantities was given proper weight, whether the court improperly considered the lessee's motive to continue producing even at low amounts merely to preserve the lease rights for speculation, and whether low market prices should be taken into consideration. We conclude the trial court's decision finding a lack of paying quantities is supported by the weight of the evidence.
{¶ 3} Lastly, Appellant contends the trial court improperly ordered it to disgorge a bonus it received from XTO Energy Inc. when Appellant assigned its deep rights in 2011, a time prior to termination of the lease. Appellant argues the elements of Appellee's second claim were not established and unjust enrichment is not available where the parties' relationship was governed by a contract, such as where the lease permitted the lessee to assign its rights. We conclude the disgorgement of the bonus was improper.
{¶ 4} For the following reasons, the trial court's judgment finding the lease terminated is affirmed, but the judgment ordering disgorgement of the bonus is reversed.
STATEMENT OF THE CASE
{¶ 5} Appellee entered an oil and gas lease, dated January 5, 2005, for 160 acres in Monroe County. The habendum clause, at ¶ 2 of the lease, contained a pre-printed primary term of 10 years, during which Appellant was to commence drilling or pay delay rentals. The secondary term was "so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee * * *." James Beck notarized the signatures of the landowners (John and Teresa Paulus) on January 5, 2005. Their relatives, who shared an interest in the oil and gas royalty, then signed on various dates, and the lease was recorded on February 28, 2005.
{¶ 6} John and Teresa Paulus also signed an agreement providing the lease would be canceled if a well was not drilled within five years from the date of the lease. The agreement was drafted by Appellant and printed on a letterhead from its Ravenna office dated January 4, 2005. Raymond Beck's name was signed, and under the signature were the circled initials DB. (Paulus Depo. Ex. 2). Pipeline agreements were also executed. Initial drilling in 2005 resulted in a "lost hole," which prevented further drilling at that spot. (Tr. 86). Upon moving the rig, the Paulus 1-A Well was drilled. It took some time to connect the well to a pipeline. (Paulus Depo. 38). The well went into production in 2007. (Tr. 87-88).
{¶ 7} In December 2011, Appellant entered an agreement with Exxon Mobil Corporation c/o XTO Energy, Inc. assigning the deep rights in the lease in return *78 for a 6.25% overriding royalty on future Utica Shale production and a signing bonus of $616,000. According to ¶ 8.1 of the agreement, the bonus was to be repaid if Appellant failed to maintain the acreage held by production for five years from the date of the assignment. (Beck Corp. Rep. Depo. 85-86, Ex. 20). The Beck lease at ¶ 13 granted Appellant the right to assign and transfer the lease in whole or in part without providing notice to Appellee.
{¶ 8} In September 2013, Appellant replaced the downhole pump at a cost of $10,503.31. (Tr. 90). The same month, Appellee executed a lease in favor of Gulfport Energy Corporation with a signing bonus of more than one million dollars plus 20% of the royalties. (Paulus Depo. 49-56; Ex. 7). Mr. Paulus testified Gulfport rejected the lease due to the Beck lease. (Paulus Depo. 56); (Tr. 61-61).
{¶ 9} On June 27, 2014, Appellee filed a complaint against Appellant. XTO was thereafter added as a defendant. The May 15, 2015 second amended complaint contained two counts. Count one sought a declaratory judgment terminating the lease due to lack of sufficient production. The complaint stated the ten-year primary term was amended to five years by an attached letter agreement. Count two was entitled "unjust enrichment equitable disgorgement" and claimed Appellant's conduct deprived Appellee of the benefits of a new lease and Appellant should be disgorged of the bonus XTO paid to Appellant.
{¶ 10} Appellant's answer stated the primary term of the lease was ten years and the letter agreement was of no effect "because, among other things, all lessors to the good and valid Beck Energy Oil and Gas Lease did not agree to and/or sign the letter agreement as a result, the Lease is still in its primary term." This statement was reiterated as one of thirty affirmative defenses; another defense said the "claims were barred in whole or in part by the parol evidence rule." Appellant filed a counterclaim for breach of contract and slander of title. Appellant also filed a motion to dismiss the "unjust enrichment equitable disgorgement" claim but did not submit a motion regarding the issue of the primary term.
{¶ 11} A bench trial was held on February 23, 2016. The parties stipulated there was oil and gas production from the well and royalties were paid as required. (Tr. 13). They agreed the court could consider Appellant's response to a request for admissions made after depositions. (Tr. 12). They also agreed the trial evidence would include the depositions of Mr. Paulus, Beck's corporate representatives (including Mr. Beck), and a Beck employee, along with the deposition exhibits. Mr. Paulus and Mr. Beck presented additional testimony at trial. Mr. Paulus testified he was entitled to gas from the well for domestic purposes. He said the well ran out of gas one day in January 2015 and Appellant's employee told him the well was dead. (Tr. 44, 76). Mr. Beck opined the well was profitable. (Tr. 70). He also noted how oil and gas prices drastically dropped three years prior to trial. (Tr. 81-82). The testimony is discussed further infra.
{¶ 12} On May 5, 2016, the trial court entered judgment in favor of Appellee on the requested declaratory relief of lease termination. The court found: Appellant spent significant sums of money in 2007 to drill and equip the well; the well yielded income beyond its operating expenses for the first few years; there were regular recurring expenses; the well ceased being profitable in 2012; the volume of gas decreased each year; despite the money spent to repair the well pump in 2013, actual production continued to decline in 2014 and 2015; Mr. Beck acknowledged a *79 financial incentive to defend the profitability of the well due to the future production of Utica Shale; and the well recently ran out of gas. The court concluded it was undisputed the costs of operating the well exceeded the revenues generated from the well in 2012, 2013, and 2014, pointing to Appellant's detailed records and the tax forms submitted in those years. Law was cited on the lessee's good faith judgment, and the depressed market was found to be irrelevant due to the steady decline in actual production.
{¶ 13} The trial court's May 5, 2016 judgment entry declared the lease terminated for lack of profitable production and dismissed Appellant's counterclaim. On May 25, 2016, the court ruled in favor of Appellee on the remaining count, ordering the bonus paid by XTO to Appellant to be disgorged. Appellant filed a timely notice of appeal on June 2, 2016.
STANDARD OF REVIEW
{¶ 14} In a declaratory judgment case, a trial court's decision on justiciability is reviewed under the abuse of discretion standard of review. Arnott v. Arnott , 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 1. Justiciability is a threshold question dealing with whether the case is appropriate for declaratory relief, including whether there is an actual controversy between the parties. Id. at ¶ 5, 10 (not every case is appropriate for a declaratory action), clarifying Mid-American Fire & Cas. Co. v. Heasley , 113 Ohio St.3d 133, 2007-Ohio-1248, 863 N.E.2d 142, ¶ 12 (where a trial court determines a controversy is so contingent that declaratory relief does not lie, the reviewing court will not reverse unless the decision is clearly unreasonable).
{¶ 15} Thereafter, legal questions are subject to de novo review whereby no deference is given to the trial court's decision. Arnott , 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586 at ¶ 1, 13. Where the final decision involves factual issues, another standard of review may be implicated. Pursuant to a specific declaratory judgment statute: "When an action or proceeding in which declaratory relief is sought under this chapter involves the determination of an issue of fact, that issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the action or proceeding is pending." R.C. 2721.10.
{¶ 16} In ordinary civil actions with issues of fact, an appellant contesting the resolution of factual issues can argue the decision was contrary to the manifest weight of the evidence. If an underlying factual determination in a declaratory action was supported by competent credible evidence, it will not be reversed on appeal. See, e.g., Shemo v. Mayfield Hts. , 88 Ohio St.3d 7, 10, 722 N.E.2d 1018 (2000), citing Seasons Coal Co. v. Cleveland , 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984) (every reasonable presumption must be made in favor of the judgment and findings of fact); Erie Ins. Group v. Fisher , 15 Ohio St.3d 380, 383-384, 474 N.E.2d 320 (1984), citing C.E. Morris Co. v. Foley Construction Co. , 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus (judgments supported by competent, credible evidence going to the material elements of the case will not be disturbed as being against the manifest weight of the evidence).
{¶ 17} Weight of the evidence concerns the inclination of the greater amount of credible evidence offered at trial to support one side of the issue over the other; it relates to persuasion and involves the effect of the evidence in inducing belief. Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 19 (applying Thompkins to civil cases), citing *80 State v. Thompkins , 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In conducting a manifest weight of the evidence review, the reviewing court is to weigh the evidence and all reasonable inferences to be drawn therefrom, consider the credibility of witnesses, and determine whether in resolving evidentiary conflicts, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. See Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541.
{¶ 18} "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." Eastley , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517 at ¶ 21, citing Seasons Coal , 10 Ohio St.3d at 80, 461 N.E.2d 1273, fn. 3 (if the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the judgment). Finally, if an appellate court finds the judgment rendered after a civil bench trial was contrary to the manifest weight of the evidence (and does not find any other prejudicial error in the briefed assignments of error), the appellate court can either weigh the evidence and render the judgment the trial court should have rendered or remand the case to the trial court for further proceedings. App.R. 12(C)(1).
ASSIGNMENT OF ERROR ONE: AMENDED PRIMARY TERM DURATION
{¶ 19} Appellant sets forth four assignments of error, the first of which provides:
"THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DECLARED BECK ENERGY CORPORATION'S LEASE TERMINATED FOR LACK OF PROFITABLE PRODUCTION BECAUSE APPELLEES LACKED STANDING TO CHALLENGE THE LEASE IN ITS PRIMARY TERM AND APPELLEES FAILED TO PRODUCE ANY EVIDENCE THAT THE LEASE DID NOT PRODUCE IN PAYING QUANTITIES DURING ITS SECONDARY TERM."
{¶ 20} Appellant asserts the face of the lease shows the primary term did not end until January 5, 2015. (Appellant's brief makes no mention of the letter agreement, which provided the lease would be canceled if a well was not drilled within five years.) Appellant concludes the June 27, 2014 complaint for lease termination was premature as production need not be in paying quantities during the primary term of a lease and the paying quantities standard is applicable only after the expiration of the primary term. See, e.g., State ex rel. Claugus Family Farm, L.P. v. Seventh Dist. Ct. of Appeals , 145 Ohio St.3d 180, 2016-Ohio-178, 47 N.E.3d 836 (affirming our Hupp case); Hupp v. Beck Energy Corp. , 2014-Ohio-4255, 20 N.E.3d 732, ¶ 87-104.
{¶ 21} Appellant frames the issue as one of standing, claiming Appellee had no standing to challenge the lease in the primary term and no injury had occurred at the time suit was filed. Appellant equates this case to the Ohio Supreme Court's Kincaid case, where the Court found an insured lacked standing to sue his insurer before a claim for reimbursement had been filed or rejected. Appellant relies on the premise that standing is jurisdictional and must be determined as of the commencement of the suit, citing the Ohio Supreme Court's decision in Schwartzwald. Appellant emphasizes the latter point because the original ten-year primary term expired by the time of trial.[1]
*81 {¶ 22} Appellee does not dispute the paying quantities standard applies to the secondary, not the primary, term of the lease. Rather, Appellee asserts the lease was in its secondary term (as of January 2010) due to a lease amendment, referring to the letter agreement providing the lease would be canceled if a well was not drilled within five years from the date of the lease. Appellee urges the assertion of an affirmative defense in the answer (which claimed the lease was in its primary term) is not sufficient to maintain the defense. Appellant was required but failed to proceed on the theory by pre-trial motion or at trial. Appellee states waiting to raise the issue until post-trial proposed findings of fact and conclusions of law was improper. Appellee notes there was no chance for Appellee to respond as the trial was over and the court did not direct the parties to rebut each other's proposals, which were both filed on the filing deadline. Appellee points to testimony admitting the only lease clause keeping the lease active was Appellant's production in paying quantities. Appellee concludes Appellant waived the alleged "standing" argument or failed to meet the burden of proof at trial for an affirmative defense.
{¶ 23} Appellant replies a lack of standing cannot be waived as it is jurisdictional and can be raised at any time. Appellant also points to Mr. Beck's testimony that the lease had a ten-year primary term. (Tr. 85). Appellant notes the lease's integration clause at ¶ 19: "this Instrument contains and expresses all of the agreements and understandings of the parties in respect to the subject matter thereof * * *." Appellant also urges application of the parol evidence rule to bar prior or contemporaneous agreements from contradicting the lease.
{¶ 24} In Kincaid, the trial court dismissed an insured's complaint for lack of standing. The Supreme Court upheld that judgment, stating the insurer did not refuse to pay a claim (for incidental expenses incurred during defense of a lawsuit) as the plaintiff never presented a claim for loss to the insurer. Kincaid v. Erie Ins. Co. , 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, ¶ 2. The Court concluded the insured lacked standing to assert the breach of contract because: "Until Erie refuses to pay a claim for a loss, Kincaid [he] suffered no actual damages for breach of contract, the parties do not have adverse legal interests, and there is no justiciable controversy." Id. at ¶ 13, 20. From this, Appellant concludes filing suit on a secondary term provision during the primary term equates to a lack of standing.
{¶ 25} Standing to sue is part of what it takes to make a case justiciable. Federal Home Loan Mtge. Corp. v. Schwartzwald , 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 21, citing Steel Co. v. Citizens for a Better Environment , 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The question of standing asks whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of the controversy. Schwartzwald , 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214 at ¶ 21. "[T]he fundamental requirement of standing is that the party bringing the action *82 must have a personal stake in the outcome of the controversy, i.e., that it must be the injured party." Deutsche Bank Natl. Trust Co. v. Holden , 147 Ohio St.3d 85, 2016-Ohio-4603, 60 N.E.3d 1243, ¶ 32.
{¶ 26} To have standing, the plaintiff must have suffered (1) an injury (2) which is fairly traceable to the defendant's conduct and (3) is likely to be redressed by the relief requested. Id. at ¶ 20. Standing depends on the nature and source of the asserted claim. Id. Standing to sue is to be determined as of the commencement of suit because it is required to invoke the jurisdiction of the common pleas court. Schwartzwald , 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214 at ¶ 24, 26, 28 (post-filing events cannot create standing). From this, the Supreme Court concluded the lack of standing could not be cured mid-suit (by obtaining a note and mortgage after suing). Id. at ¶ 40-41.
{¶ 27} Thereafter, the Court clarified the type of jurisdiction referred to in Schwartzwald was not subject matter jurisdiction. Bank of America, N.A. v. Kuchta , 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, ¶ 19-23. The defense of lacking subject matter jurisdiction can be raised at any time and is not precluded by doctrines such as waiver or res judicata. See id. at ¶ 17 (a judgment by a court lacking in subject matter jurisdiction is void ab initio).
{¶ 28} However, where the common pleas court has subject-matter jurisdiction over the action, the court "does not lose that jurisdiction merely because a party to the action lacks standing." Id. Rather, standing involves the "court's jurisdiction over a particular case [which] refers to the court's authority to proceed or rule on a case that is within the court's subject-matter jurisdiction." Id. at ¶ 19. This type of jurisdiction, sometimes called the "third type of jurisdiction," involves consideration of the individual parties' rights and can only render a judgment voidable. Id. ; Pratts v. Hurley , 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 12. An evaluation of standing considers the right of an individual party to bring the action since a party must assert a personal stake in the outcome. Kuchta , 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040 at ¶ 23.
{¶ 29} Upon concluding a lack of standing does not justify a collateral attack on a judgment, the court noted: "Lack of standing is certainly a fundamental flaw that would require a court to dismiss the action, Schwartzwald at ¶ 40, and any judgment on the merits would be subject to reversal on appeal." Id. Notably, the issue of standing was raised at the trial court level in Schwartzwald (but the trial court nonetheless granted summary judgment to the plaintiff). See Schwartzwald , 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214 at ¶ 2. The reference to "subject to reversal on appeal" in Kuchta could encompass a case where standing was properly raised and pursued below or a case where the reviewing court chooses to exercise its discretion to recognize plain error. The Supreme Court has pointed out: "While a reviewing court may consider a challenge to the court's subject-matter jurisdiction for the first time on appeal , * * * either at the parties' suggestion or sua sponte, * * * neither res judicata nor standing implicates subject-matter jurisdiction." Lycan v. Cleveland , 146 Ohio St.3d 29, 2016-Ohio-422, 51 N.E.3d 593, ¶ 27 (citations omitted and emphasis added). This court has ruled a lack of jurisdiction over a particular case (as opposed to subject matter jurisdiction) cannot be raised on the appeal if the defendant did not proceed on such a defense before or during trial after raising it in the answer.
*83 Cosgrove v. Omni Manor , 2016-Ohio-8481, 78 N.E.3d 223, ¶ 46-47, 53 (the answer is not self-executing, and the defendant forfeited the jurisdictional argument by failing to raise it until after trial). In sum, where an appellant failed to preserve at the trial level the error in the alleged improper exercise of jurisdiction over a particular case, the appellant waived all but plain error. In re J.J. , 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851, ¶ 13, 15.
{¶ 30} Use of the plain error doctrine is discretionary with the reviewing court. See, e.g., Risner v. ODNR , 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27. Besides being outcome-determinative, the claimed error must be obvious from the record. State v. Davis , 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 378. The plain error doctrine is employed even more sparingly in civil cases than it is in criminal cases. In civil cases, the doctrine of plain error "is sharply limited to the extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." Goldfuss v. Davidson , 79 Ohio St.3d 116, 122, 679 N.E.2d 1099 (1997). In other words, an obvious error must seriously affect the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. Id. at ¶ 1 of syllabus.
{¶ 31} Plain error is not apparent here. In addition, the issue may not qualify as one involving standing. For instance, where a party sued on a Pugh Clause while the lease was still in its primary term, we found the clause inapplicable because the lease was in the primary term, but we did not construe the issue as one implicating standing to file suit. See Summitcrest, Inc. v. Eric Petroleum Corp. , 2016-Ohio-888, 60 N.E.3d 807. In Hupp , the landowners sued Beck Energy during the primary term. In part, the landowners claimed Beck violated an implied covenant of reasonable development even though the lease had a definite primary term with delayed rentals and had an express clause disclaiming implied covenants. We rejected this argument and reversed the trial court, but we did not frame the issue as one of standing or jurisdiction. Hupp , at ¶ 122. Nor did the Ohio Supreme Court frame the issue as standing when affirming our decision and holding an implied covenant to reasonably develop cannot be imposed in the primary term of the same Beck lease used in this case.[2] See, e.g., State ex rel. Claugus Family Farm , 145 Ohio St.3d 180, 2016-Ohio-178, 47 N.E.3d 836 at ¶ 31-33.
{¶ 32} Here, Appellee filed suit on the lease claiming it had a five-year primary term as the ten-year term in the lease had been amended by a separate agreement which was attached to the complaint. The answer said the separate agreement was not effective as it was not signed by every lessor. Appellants do not maintain this particular argument on appeal, possibly as Mr. Beck was the party to be charged under the agreement and he signed it. One of the many affirmative defenses asserted in the answer was the parol evidence rule. No motion to dismiss or motion for summary judgment was filed as to the primary terms of the lease claim.
{¶ 33} Mr. Paulus testified at deposition that in consideration for other leases he was entering, he asked if the ten-year primary term in the lease could be changed to a five-year primary term. (Paulus *84 Depo. 28). He identified the agreement and said the purpose of it was to change the primary term from ten years to five years. (Paulus Depo 29, Ex. 2). Before asking Mr. Paulus about the drilling of the well, defense counsel said his understanding was that pursuant to the lease and the amendment, Beck Energy had five years to drill. (Paulus Depo 34-35). This deposition with exhibits was admitted as trial evidence. Defense counsel's opening statement at trial indicated the issue before the trial court was paying quantities. (Tr. 7-10).
{¶ 34} During the deposition of Beck Energy's corporate representatives, Appellee's counsel advised he did not want to be surprised at trial by an assertion that a clause other than producing in paying quantities was keeping the lease in effect, such as delay rentals, shut-in, or force majeure. Mr. Beck answered there was no other provision keeping the lease from terminating. (Corp. Depo. 12-13). The deposition was admitted as trial evidence. During his subsequent testimony at trial, Mr. Beck was asked: "Other than the disputes over whether the well is producing in paying quantities, you are not claiming that any other section of the lease keeps the lease from expiring, true?" And, Mr. Beck responded, "True." (Tr. 16). Mr. Beck's testimony about a ten-year primary term was based upon his attorney's introduction of the lease as an exhibit at trial and a specific question as to how long the lease in front of him stated it would last. (Tr. 85).
{¶ 35} At the end of trial, the court asked for post-trial briefs. Appellant filed proposed findings of fact and conclusions of law, wherein it was claimed the suit was "prematurely filed" during the ten-year primary term of the lease at a time when the only obligation was to drill or pay delay rentals; as they had drilled, they were in compliance with their lease obligation. (Proposed Findings at 1-2, 4, 12-13). Appellant did not frame the issue as standing or mention the parol evidence rule. (Appellant also argued if the lease was not in the primary term at initiation of the suit, then the production was in paying quantities.)
{¶ 36} As aforementioned, Appellant's reply brief cites the parol evidence doctrine to counter Appellee's assertion of a five-year primary term due to lease amendment. Appellant did not address lease amendment in the initial brief. A reply is not the proper place for raising original, substantive arguments not raised in the appellant's brief, especially where they were not maintained below in a civil case. See, e.g., Reed v. Jagnow , 7th Dist. No. 12 MA 201, 2013-Ohio-2546, 2013 WL 3178406, ¶ 42 ; Wells Fargo Bank, N.A. v. Jarvis , 7th Dist. No. 08CO30, 2009-Ohio-3055, 2009 WL 1805463, ¶ 34-36 ; Julian v. Creekside Health Ctr. , 7th Dist. No. 03MA21, 2004-Ohio-3197, 2004 WL 1376214, ¶ 81 ; Scibelli v. Pannunzio , 7th Dist. No. 02CA175, 2003-Ohio-3488, 2003 WL 21505068, ¶ 11.
{¶ 37} In any event, the record does not mandate a finding that the lease amendment letter agreement was prohibited parol evidence. "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements'." Galmish v. Cicchini , 90 Ohio St.3d 22, 27, 734 N.E.2d 782 (2000), quoting 11 Williston on Contracts , Section 33:4, 569-570 (4th Ed. 1999). The rule serves to protect the integrity of written contracts. Galmish , 90 Ohio St.3d at 27, 734 N.E.2d 782 (ensuring stability, predictability, and enforceability of finalized written *85 agreements). It prohibits antecedent understandings from varying a subsequent writing containing the complete terms of the agreement (the integration[3] ). See, e.g., TRINOVA Corp. v. Pilkington Bros. PLC , 70 Ohio St.3d 271, 275, 638 N.E.2d 572 (1994) (contract integration calls for a prior writing to be rejected in favor of a subsequent one containing a complete agreement).
{¶ 38} The parol evidence rule is a rule of substantive law (rather than a rule of evidence or contract interpretation). Id. On this basis, the Supreme Court has applied the rule to claims brought under the Consumer Sales Practices Act. Williams v. Spitzer Autoworld Canton, L.L.C. , 122 Ohio St.3d 546, 2009-Ohio-3554, 913 N.E.2d 410. In doing so, the Court noted other courts have pointed to the rule's substantive nature to conclude "testimony introduced in violation of the rule, even in the absence of objection thereto, can be given no legal effect." Id. at ¶ 14 (quoting other courts). The issue was raised in the Williams case via a motion for directed verdict, and the issue of waiver was not before the Court.
{¶ 39} Previously, the Supreme Court observed: "While arguably appellants are correct that objection to the admission of parol testimony cannot be waived, [citing an appellate case], we believe that more than a mere waiver of error is at issue in the cause sub judice." Center Ridge Ganley, Inc. v. Stinn , 31 Ohio St.3d 310, 313, 511 N.E.2d 106 (1987) (emphasis added). Under the invited error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make. Id. In that case, the appellant called a witness "as on cross-examination" and elicited testimony on the parties' intent when entering the contract. The Court concluded this invited the appellee to introduce similar but contradictory evidence of intent. Id.
{¶ 40} Here, Appellant's attorney deposed Mr. Paulus as on cross-examination, voiced his understanding that Beck Energy had five years to drill under the lease "and the amendment to that oil and gas lease," and elicited testimony on the amended primary term. (Paulus Depo. 28-34). The deposition and its exhibits were then presented to the court as trial evidence by Appellant . (Tr. 73). The letter agreement, said to be an amendment to the lease, was Appellant's own exhibit . This is invited error, especially considering all of the surrounding circumstances, including Appellant's opening statement and the testimony presented by Appellant's corporate representative at deposition and at trial, which admitted the only clause maintaining the lease involved profitable production or paying quantities.
{¶ 41} Finally, "[e]vidence of subsequent agreements or modifications of a contract does not fall within the parol evidence rule." Monroe Excavating, Inc. v. DJD & C Dev., Inc. , 7th Dist. No. 10 MA 12, 2011-Ohio-3169, 2011 WL 2552720, ¶ 28. In other words: "The parol evidence rule does not apply to evidence of subsequent modifications of a written agreement or to waiver of an agreement's terms by language or conduct." Star Leasing Co. v. G & S Metal Consultants, Inc. , 10th Dist. No. 08AP-713, 2009-Ohio-1269, 2009 WL 714146, ¶ 29. See also *86 Ayres v. Burnett , 2d Dist. No. 2013-CA-88, 2014-Ohio-4404, 2014 WL 4953545, ¶ 13 ; Kirkwood v. FSD Dev. Corp. , 8th Dist. No. 95280, 2011-Ohio-1098, 2011 WL 826295, ¶ 11.
{¶ 42} Appellant's reply brief relies on the fact the letter agreement had a typed date in the heading that fell one day before the notarization of the signatures of John and Teresa Paulus on the oil and gas lease. Yet, there was no testimony elicited as to what date the amendment was signed. We note this was a letter originating out of Appellant's Ravenna office. The signatures of John and Teresa Paulus on the lease were notarized on January 5, 2005 in Woodsfield. The letter referred to the lease, implying an existing lease was being amended. The deposition testimony of Mr. Paulus, which was submitted as evidence at trial, also suggested the lease was in existence when the amendment was entered. He referred to his entry into other leases as the motivation for Beck agreeing to shorten the ten-year primary term. No testimony was elicited from Mr. Paulus to clarify the affirmative defense and to persuade the court the letter must be considered parol evidence as opposed to an amendment. Nor was such testimony elicited from Mr. Beck whose name was signed on the agreement (by a person who initialed the signature and who did not testify).
{¶ 43} Considering the evidence in light of its context and source, the trial court was not barred from relying on the amendment and focusing on the issue presented to it: paying quantities. For all of these reasons, this assignment of error is overruled.
ASSIGNMENTS OF ERROR TWO & THREE: PAYING QUANTITIES
{¶ 44} Appellant's second and third assignments of error, which both discuss paying quantities, provide:
"THE TRIAL COURT ERRED WHEN IT DECLARED BECK ENERGY CORPORATION'S LEASE TERMINATED FOR LACK OF PROFITABLE PRODUCTION BECAUSE FROM 2007 THROUGH 2014 THE WELL PRODUCED A NET PROFIT OF INCOME FROM OIL AND/OR GAS IN THE AMOUNT OF $10,253.96."
"THE TRIAL COURT ERRED WHEN IT FAILED TO CONSIDER LESSEE'S JUDGMENT THAT THE PAULUS 1-A WELL IS PROFITABLE AND PRODUCING OIL AND/OR GAS IN PAYING QUANTITIES."
{¶ 45} As aforementioned, the habendum clause provided the lease would continue in the secondary term for "so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee * * *." The Ohio Supreme Court has adopted the standard definition of paying quantities: "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." Blausey v. Stein , 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980).
{¶ 46} In Blausey , the trial court terminated a lease after finding the lessee's gross receipts ($2,220.28) were exceeded by his operating costs ($3,741.04) over a six-year period. In arriving at the figure for operating costs, the trial court added the value of the lessee's labor (which it valued at $2,887.50) to the paid operating expenses ($853.54). The Ohio Supreme Court concluded the lessee's own labor *87 should not have been included as an operating expense, noting he performed all the labor necessary to produce oil from the leasehold and made no direct expenditures from gross receipts for labor. Id. at 266, 400 N.E.2d 408. "The fact that a lessee can keep operating costs at a minimum should inure to his benefit in a determination of whether a well produces in paying quantities." Id. , citing Weisant v. Follett , 17 Ohio App. 371 (7th Dist. 1922).
{¶ 47} "Because an oil and gas lessee bears the risk of nonproduction in a lease of this kind, we believe that appellee should be allowed to attempt to recoup his initial investment for as long as he continues to derive any financial benefit from production." Blausey , 61 Ohio St.2d at 266, 400 N.E.2d 408. Even though the Supreme Court described the well as "intermittently" and "only marginally productive," the Court found the well was producing in paying quantities due to the results of the paying quantities equation. See id. (the well made $1,366.74 over a six-year period, which included a period of no sales and a period of temporary cessation in production).
{¶ 48} We begin with a discussion of whether certain items should be subtracted from Appellant's income before determining profit. Appellant points to the royalties paid to Appellee each year and notes this court's statement: "While not conclusive evidence, royalty payments can be evidence of production in paying quantities." See RHDK Oil & Gas, L.L.C. v. Dye , 7th Dist. No. 14 HA 0019, 2016-Ohio-4654, 2016 WL 3522555, ¶ 30, citing Bohlen v. Anadarko E & P Onshore, LLC , 2014-Ohio-5819, 26 N.E.3d 1176. It should be noted Bohlen spoke of royalties paid and profit made, but first pointed to district precedent stating, "The amount of royalties paid has no relevancy as to whether a well is actually 'producing in a paying quantity'." Id. at ¶ 28.
{¶ 49} In any event, the relevancy of the royalties paid to the lessor depends on the issue presented to the court. The payment of royalties can be used to show a well-produced. Mathematically, the royalties paid to the lessor can be used to calculate the lessee's gross income. For instance, as the royalty is a particular fraction (1/8) of the price received for the gas produced by lessee, one could calculate the production in cases where such numbers are not available. Where (as here), the record relied upon by both sides at trial shows the amount of production, income, and operating expenses; the royalties need not be utilized as proof of actual production or as a method to determine gross income.
{¶ 50} This leads to the question of whether royalties should be subtracted from gross income (along with operating expenses) in order to determine a lessee's profit. The chart at page 11 in Appellant's brief subtracts from income both operating expenses and royalties paid to Appellee to arrive at profit or loss[4] in the horizontal rows. Yet, when calculating the profit and loss down the vertical columns of years, the amount of profit for the life of the well ($10,253.96 profit from 2007 through 2014) does not correspond to the preceding figures in the rows; instead, the alleged profit figure for the life of the well corresponds to the total income minus the total operating expenses without removing royalties from income (even though royalties admittedly make up part of the reported income figure). Appellant mentions (in a footnote in the reply brief) it inadvertently deducted *88 royalties from income when arriving at profit in the rows of its chart.
{¶ 51} Appellee protests this calculation, insisting the royalties paid to the lessor cannot be used as part of the profit figure for the lessee. Appellant's reply points to a chart Appellee used as an exhibit at deposition. Royalties are not listed, and the chart arrives at profit by subtracting income from expenses. Appellant suggests Appellee should be bound by this chart.
{¶ 52} However, Appellee constructed the chart prior to the deposition from the discovery figures provided by Appellant. At deposition, Appellee's counsel asked Beck's corporate representative whether royalties were deducted from the income figures or added to the expense figures. The corporate representative explained the income figures provided in discovery did not have the royalties subtracted from them; nor did the operating expense figures have the royalties added to them. (Corp. Rep. Depo 21-26, 29-30). Appellee then elicited from the corporate representative that the profit figures in the chart (constructed from discovery responses) should actually be adjusted due to the payment of royalties. Compare Potts v. Unglaciated Industries, Inc. , 2016-Ohio-8559, 77 N.E.3d 415, ¶ 88 (a case evaluating only the lessee's initial summary judgment burden; relying on evidence of revenues paid to the lessee by an oil purchaser after royalties were distributed by the oil purchaser).
{¶ 53} Logically, a lessee cannot report income under the Blausey equation without first subtracting the royalties paid to the lessor from income or adding the royalties to the operating expenses.[5] That is, "paying quantities" is defined as those "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." Blausey, 61 Ohio St.2d at 265-266, 400 N.E.2d 408. A royalty paid to the lessor from the well's production (which is represented in the gross income figure) cannot qualify as "profit * * * to the lessee over operating expenses * * *." See id.
{¶ 54} This is in accordance with holdings in other jurisdictions. See, e.g., Lough v. Coal Oil, Inc. , 217 Cal.App.3d 1518, 1531, 266 Cal.Rptr. 611 (1990) (a royalty paid to the lessor is an operating expense); Transport Oil Co. v. Exeter Oil Co. , 84 Cal.App.2d 616, 623, 191 P.2d 129 (1948) (a landowner royalty is deducted from income as an operating expense, but subsequent royalties which are not part of the basic lease should not be deducted); 6 William & Myers, Oil and Gas Law , Section 604.5 (2012), fn. 4 (noting a regulation of the United States Department of Interior interprets paying quantities as a positive stream of income after subtracting normal expenses, which include royalties and direct lease operating costs).
{¶ 55} The next issue is whether $10,503.31 spent on the well in 2013 should be included in the operating expenses for that year. The parties agree the initial drilling and equipping costs are not to be considered in determining paying quantities. Appellant asks us to use this premise to exclude from operating expenses the cost to "rework" the well in 2013. Specifically, Appellant was required to replace a downhole pump by means of a "work-over rig" and to rebuild the wellhead as a result of the pump replacement. Appellant characterizes *89 this as an "extraordinary expense" or a "reworking" cost attributable to capital. Appellee initially counters there is no legal distinction between regular and extraordinary expenses in the law of oil and gas.
{¶ 56} The definition of paying quantities set forth in Blausey excludes drilling and equipping costs from operating expenses. See Blausey , 61 Ohio St.2d at 265-266, 400 N.E.2d 408. The exact definition did not limit the exclusion to initial drilling and equipping costs. The Court reasoned: "Because an oil and gas lessee bears the risk of nonproduction in a lease of this kind, we believe that appellee should be allowed to attempt to recoup his initial investment for as long as he continues to derive any financial benefit from production." Blausey , 61 Ohio St.2d at 266, 400 N.E.2d 408. While, this was a rationale for the Court's holding, which involved excluding the lessee's own labor from operating expenses; it does not appear to be an attempt to add the modifier of "initial" drilling and equipping costs to the definition of paying quantities.
{¶ 57} The United States Court of Appeals for the Fourth Circuit has read West Virginia law as excluding capital expenditures from the operating expenses part of the profit analysis, due to that state's use of the standard paying quantities definition (similar to the Blausey holding). Imperial Colliery Co. v. Oxy USA Inc. , 912 F.2d 696, 706 (4th Cir. 1990), citing Lowther Oil Co. v. Miller-Sibley Oil Co. , 53 W.Va. 501, 44 S.E. 433, 436 (1903) ("If the well pays a profit, even small, over operating expense, it produces in paying quantity, though it may never repay its cost, and the operation as a whole may result in a loss.").
{¶ 58} In Texas, it has been observed: "fixed or periodic cash expenditures incurred in the daily operation of a well (sometimes called out-of-pocket lifting expenses) are to be classified as operating expenses, while one time investment expenses, such as drilling and equipping costs are to be treated as capital expenditures." Pshigoda v. Texaco, Inc. , 703 S.W.2d 416, 418 (Tex.App.1986). See also Evans v. Gulf Oil Corp. , 840 S.W.2d 500, 504 (Tex.App.1992) (reworking expenses are part of the capital investment). "A reworking expenditure is analogous, and closely related, to the initial drilling expenses" as it is usually a one time, single expense item treated as a capital investment. Pshigoda , 703 S.W.2d at 418-419. "Because [the reworking expense] is not an ongoing expense, the operator may eventually recover it if the well continues to show a profit above normal operating expenses, just as the operator may eventually recover the initial drilling and equipment costs." Id. at 419 (concluding it is logical and consistent with the law excluding drilling and equipping expenses from the equation to permit the fact-finder to exclude reworking expenses).
{¶ 59} In Louisiana, courts have ruled "nonrecurring expenses are not considered as operating expenses for the purpose of determining production in paying quantities." Middleton v. EP Energy E & P Co., L.P. , 188 So.3d 263, 267 (La.App.2016) (well expenses involved in installation of a compressor and "workover operations" were said to be "extraordinary expenses"). "Workover expenses, considered to be extraordinary expenses, are generally distinguished from operating expenses and should not be included as an operating expense when determining if there was production in paying quantities." O'Neal v. JLH Enterprises, Inc. , 862 So.2d 1021, 1027 (La.App.2003), citing Lege v. Lea Exploration Company, Inc. , 631 So.2d 716, 719 (La.App.1994) ("we choose to follow the more traditional understanding that an expenditure's classification is generally determined *90 more by whether it is ordinary and recurring or extraordinary and largely non-recurring in nature").
{¶ 60} Appellee suggests, even if certain reworking can be excluded from operating expenses, the replacement of the pump should merely be considered a normal repair or maintenance expense, citing the Lough case out of California. According to the case cited by Appellee, current operating expenses include: cleaning and servicing a well; labor costs, including the costs of hiring a pumper; taxes; electricity; and lessor royalties. Lough v. Coal Oil, Inc. , 217 Cal.App.3d 1518, 1531, 266 Cal.Rptr. 611 (1990). The Lough court found the re-perforation and testing of an existing casing should be expensed rather than capitalized because it did not involve the installation of new equipment on an existing well. Id. In the case before us, the pump would be considered new equipment (and the other work was required by the new equipment's installation).
{¶ 61} In sum, the $10,503.31 spent due to pump replacement in 2013 can be considered a non-recurring, capital investment to be excluded from operating expenses as an equipping cost under Blausey .
{¶ 62} Before turning to the paying quantities calculation, another question on operating expenses is presented. Appellee points out the reported operating expenses became artificially lower upon Appellant's decision to stop accounting for the labor involved in pumping the well after the September 2013 pump replacement. (Beck Corp Rep. Depo. 47-50). The same salaried Beck employee took care of the well before and after the replacement. In the prior years, Appellant allocated amounts to operating expenses depending on this employee's time at the well. Thereafter, Appellant "decided not to charge some of the wells because the gas and oil prices are so low." (Beck Corp. Rep. Depo. 50). From this, Appellee concludes the 2014 loss was actually more than $292.55; in addition, the $4.47 in profit for 2013 would not have existed if the method for reporting operating costs was not changed in September 2013.
{¶ 63} Labor directly related to production is considered an operating expense; the portion of labor incurred for lifting costs represents a periodic cash expenditure incurred in the daily operation of the well. See, e.g., Lough. , 217 Cal.App.3d at 1531, 266 Cal.Rptr. 611 (current operating expenses include: cleaning and servicing a well; labor costs, including the costs of hiring a pumper; taxes; electricity; and lessor royalties). This appears inherent in the Blausey case. When Blausey concluded the individual lessee's own labor should not have been included as an operating expense, the Ohio Supreme Court specifically pointed out the lessee personally performed all the labor necessary to produce oil from the leasehold and made no direct expenditures from gross receipts for labor. Blausey , 61 Ohio St.2d at 266, 400 N.E.2d 408.
{¶ 64} Here, we have a corporate lessee who admits the company stopped allocating internal operating expenses to a well which was visited by a salaried employee for which pumping costs were previously allocated. (This is not a case of an individual or even a corporate shareholder performing the work for free.) Notably, Appellant subtracted the costs attributable to its in-house pumper from its operating expenses in other years. It was treated as a direct expense attributable to production from this well, just as it would have been if an independent contractor performed the service. We agree Appellant artificially deflated its operating expenses, which was a relevant consideration in the paying *91 quantities analysis.[6]
{¶ 65} Next, Appellant complains the trial court's judgment entry says Mr. Beck speculated the well would become profitable again if market prices rose. Appellant notes Mr. Beck actually testified, "it's profitable," in the present tense, and he merely added it would become "more profitable" if prices rose. (Tr. 99-100). He estimated gas prices were down 60-70% in the past three years and oil prices were down 75-80%. (Tr. 81-82). As to his prediction on prices rising, Mr. Beck explained he was not an economist and used common sense to arrive at his conclusion that "[w]hen things get to the bottom, they don't stay there." (Tr. 95-96). Although Mr. Beck testified these were not normal market conditions, there was no indication the high rates experienced prior to the decline would be considered "normal" or likely to recur in the near future.
{¶ 66} Appellee's brief states the condition of the market is irrelevant. Although Appellant's brief did not argue the low market prices should excuse the lack of profit in recent years, Appellant's reply brief claims a lease may be held by less than paying quantities due to depressed market prices. Appellant cites 3 Williams & Myers, Oil and Gas Law , Section 604.6(c) (2012), which states, "* * * if present production under normal conditions would be in paying quantities, and if the lessee in good faith decides that he can better himself financially in the long run from production at the current rate, the better rule would seem to be to allow the lessee to continue to hold the lease, despite a current loss due to depressed market conditions."
{¶ 67} As Appellee points out, low market prices can be guarded against by use of the lease's shut-in clause. In addition, the declining production over time and the instances of insufficient supply to the lessor's house were not attributable to market conditions. Moreover, the cited treatise acknowledges how critics of the above statement observe it is not possible to determine a "normal" price of oil and gas or to ascertain when and if past prices will be restored. 3 Williams & Myers, Oil and Gas Law , Section 604.6(c) (2012), fn. 3.1. The treatise also notes this difficulty may have led some jurisdictions to consider a fall in prices as one factor in the determination of whether a reasonably prudent operator would continue to hold the lease. See id. , citing Clifton v. Koontz , 160 Tex. 82, 89, 325 S.W.2d 684, 691 (1959). For instance, the cited jurisdiction first applies the mathematical formula within the standard definition of paying quantities (adopted in Blausey ). See Clifton , 160 Tex. at 89, 325 S.W.2d 684. If the well does not pay a profit, "the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated." Id. See also BP America Prod. Co. v. Laddex, 60 Tex.Sup.Ct.J. 542, 513 S.W.3d 476 (2017) (explaining the time period for the equation and the reasonableness of continuing production are factual questions).
{¶ 68} Profitability, under the income minus operating expenses equation, is the standard in Ohio. Although the Ohio Supreme *92 Court did not expressly add a second step dealing with good faith (after a loss is calculated), the application of Blausey still involves various equivalent considerations in determining a reasonable base period for the equation in a particular case.
{¶ 69} On this topic, Appellant argues the trial court improperly disregarded the lessee's good faith judgment on paying quantities and improperly considered the lessee's motive. The trial court set forth law on the good faith judgment of the lessee. The court also found Appellant admitted to having "a major financial incentive in defending the profitability of the well because of the future production and economic benefit from the Utica Shale." Notably, Appellant received a $616,000 signing bonus from XTO, which Appellant was contractually obligated to repay to XTO if the lease was not maintained for five years after the December 2011 assignment of deep rights. Appellant was also entitled to a 6.25% overriding royalty interest on future Utica Shale production by XTO.
{¶ 70} In arguing the trial court improperly considered Appellant's motive in defending the lease, Appellant points to this court's Burkhart case, which referred to the standard of a lessee's good faith judgment but then stated motive to hold the lease until an assignee could conduct deep-drilling was irrelevant to the issue of paying quantities. Burkhart Family Trust v. Antero Resources Corp., 2016-Ohio-4817, 68 N.E.3d 142, ¶ 29. Similarly, this court subsequently held: "[the lessee's] financial motive for attempting to maintain the Lease is irrelevant to the issue in this case, which is whether the Lease ended by its terms for lack of production in paying quantities. Clearly, all of the parties involved in this litigation have a financial motive." Lang v. Weiss Drilling Co. , 2016-Ohio-8213, 70 N.E.3d 625, ¶ 54 (we then concluded the trial court's mention of the lessee's financial motive did not affect the weight of the evidence supporting the trial court's judgment).
{¶ 71} Initially, we note Appellant's motive was not the crux of the trial court's decision; the court relied on the monetary figures and the decline in production. Typically, motive to render less than candid testimony or opinions can be relevant to credibility and judgment. We note Appellant relied on evidence of Appellee's financial motive as well. Moreover, the trial court observed the lease appears to be held for future speculation as opposed to current production in paying quantities; a policy reason behind paying quantities law is to avoid the holding of leases for pure speculation. The point expressed in Lang may be that motive would not alter the numbers once plugged into the equation (to show profits or lack of profits as required under Blausey ). In other words, there is nothing suspicious about a lessee wishing to maintain a lease due to hopes of future deep drilling, but the lessee must produce in paying quantities to currently maintain the lease.
{¶ 72} Appellee asks how the lessee's motive could be considered irrelevant if a court is considering the good faith of the lessee on paying quantities. Appellee urges all direct and circumstantial evidence and inferences could be relevant to a good faith analysis, including whether the lessee is holding the lease for speculation, citing T.W. Phillips Gas & Oil Co. v. Jedlicka , 615 Pa. 199, 208, 42 A.3d 261 (2012).
{¶ 73} The Pennsylvania Supreme Court in the cited Jedlicka case explained that if the income minus expenses calculation shows a loss in a certain year, then the lessee's good faith judgment is assessed. See id. at 224-225, 42 A.3d 261 (dealing with a $40 loss one year). The court pointed *93 out: "profits must be measured over some time period, and, as we discuss below, setting a reasonable time period necessarily implicates the operator's good faith judgment." Id. at 216, 42 A.3d 261. The Pennsylvania Supreme Court cited the aforementioned Clifton case from the Texas Supreme Court, noting the many circumstances to be considered in determining whether a reasonably prudent operation would continue to operate a sporadic well. Id. at 217-218, 42 A.3d 261. The Clifton case listed factors such as: the depletion of the reservoir; the price the lessee is able to obtain; the relative profitableness of other wells in the area; the operating and marketing costs of the lease; his net profit; the lease provisions; a reasonable period of time under the circumstances; and whether or not the lessee is holding the lease merely for speculative purposes. Clifton , 160 Tex. at 89, 325 S.W.2d 684.
{¶ 74} In Kansas, paying quantities are said to be judged by an "objective standard" which uses the "mathematical computation" found in the standard paying quantities definition. Reese Enterprises, Inc. v. Lawson , 220 Kan. 300, 300-301, 553 P.2d 885 (1976). Subsequently, in determining what time period to use in the computation, the Kansas Supreme Court held the reasonableness of the period depends on the totality of the circumstances in each case. Texaco, Inc. v. Fox , 228 Kan. 589, 593, 618 P.2d 844 (1980) (thirteen years is too long; the trial court erred in viewing each year individually rather than cumulatively). The period should encompass information which a prudent operator would take into account in whether to continue or to abandon the operation. Id. , citing 2 Kuntz, Oil and Gas s 26.7(u) (1964). In making the calculation, the question of "profitability on an oil and gas lease should be determined over a relatively long period of time in order to expose the operation to the leveling influences of time." Id. (but noting an unreasonably long period could use past glories to distort the result in a manner which is not reflective of the current lease status).
{¶ 75} We also note good faith can be relevant to Ohio cases involving a temporary cessation in production. It is universally recognized the mere temporary cessation of production will not cause the lease to terminate under the habendum clause where the lessee uses reasonable diligence and good faith in attempting to resume production. Dennison Bridge, Inc. v. Resource Energy, L.L.C. , 2015-Ohio-4736, 50 N.E.3d 242, at ¶ 22, 35-36 (consider the totality of the circumstances). It is in the very nature of an oil and gas well for production interruptions to occur ranging from temporary to permanent. Id. at ¶ 24, citing Wagner v. Smith , 8 Ohio App.3d 90, 92, 456 N.E.2d 523 (4th Dist. 1982). Here, the 2013 pump replacement occurred quickly, and we have no argument about an excludable, temporary period of non-production.
{¶ 76} In rejecting an argument on lease perpetuity, this court stated the phrase "in the judgment of the Lessee" does not permit the lease to continue in perpetuity at the lessee's sole and arbitrary discretion because a good faith standard is imposed on the lessee's judgment when determining paying quantities. See Hupp , at ¶ 103, citing Weisant v. Follett , 17 Ohio App. 371 (7th Dist. 1922) (reviewing cases in various states for propositions such as: "The lessee, acting in good faith and upon his honest judgment, not an arbitrary judgment * * * "; "His judgment, when bona fide, is entitled to great weight in determining whether the gas is in fact produced in paying quantities"; "the lessee is the sole judge on this question, and as long as he can make a profit therefrom, *94 he will be permitted to do so"; and "largely left to his good judgment").
{¶ 77} In the appeal of our Hupp case, the Ohio Supreme Court did not review this particular statement. See State ex rel. Claugus Family Farm, L.P. v. Seventh Dist. Court of Appeals , 145 Ohio St.3d 180, 2016-Ohio-178, 47 N.E.3d 836. While explaining the lease phrases "capable of being produced" and "in the judgment of the Lessee" refer to an existing well (not to undeveloped land), the Court noted Beck argued paying quantities should be viewed from the lessee's perspective. Id. at ¶ 27-28. Viewing paying quantities from the lessee's perspective (which the Court simply set forth as Beck's position) appears to be encompassed in the Blausey rationale, allowing the lessee to maintain the lease even with very small profits to the lessee over operating expenses (without regard to drilling and equipping costs). That is, the Court essentially defers to lessee's judgment by allowing the lessee to continue even though the operation as a whole does not profit as long as the income minus current operating expenses makes a profit.
{¶ 78} In the alternative to arguing we should leave determination of the lessee's good faith to the trial court, Appellee urges we need not resort to the subjective good faith standard where there are detailed records of production and expenses. The Blausey case defined paying quantities mathematically and objectively without referring to the good faith of the lessee.[7] The Supreme Court specifically noted the "base period" was not contested in Blause y. Here, there is an issue with the time period utilized in the paying quantities analysis. Assignment of the period can be influenced by various considerations, requiring an assessment of the totality of the circumstances and the good faith of the lessee.
{¶ 79} We turn to the numbers. Appellant asks this court to utilize the figures for the life of the well's production beginning in 2007, arguing the trial court's focus was too narrow. We begin with these figures and will then discuss the reasonable time frame for the paying quantities analysis.
{¶ 80} After providing free gas to Appellee, the well-produced for sale: 637 mcf of natural gas in 2007 and no oil; 659 mcf of natural gas and no oil in 2008; 514 mcf of natural gas and 18 barrels of oil in 2009; 443 mcf of natural gas and 20 barrels of oil in 2010; 364 mcf of natural gas and 5 barrels of oil in 2011; 267 mcf of natural gas and 2 barrels of oil in 2012; 228 mcf of natural gas and no oil in 2013; and 203 mcf of natural gas and no oil in 2014. Upon subtracting royalties and the ordinary operating expenses listed in Appellant's chart, this resulted in the following profit (or loss): $2,191.20 in 2007; $3,699.82 in 2008; $1,535.93 in 2009; $172.19 in 2010; $314.29 in 2011; (negative $749.91) in 2012; $4.47 in 2013; and (negative $292.55) in 2014.
{¶ 81} This totals $6,875.44 in profit over this time span. Just prior to trial, the figures for most of 2015 were provided in discovery and submitted as evidence at trial. From January 1, 2015 through November 18, 2015, the well produced 199 mcf of natural gas, yielding a gross revenue *95 of $413.17 (compared to the gross revenue of $752.05 in 2014, which was a year of loss after subtracting operating expenses and royalties). (Resp. 2d Set of Req. for Admissions).
{¶ 82} The trial court found the well's operating costs exceeded its revenues in 2012, 2013, and 2014 and the well ceased being profitable in 2012. The 2012 loss was $749.91. Removing the extraordinary expense incurred in 2013 (but subtracting lessor royalties from gross income), Appellant's profit that year was still only $4.47 at most. As Appellee points out, the ordinary operating expenses drastically decreased in 2013, compared to 2011 and 2012, as Appellant stopped accounting for the actual costs incurred internally to service the well. Despite the pump replacement in 2013, actual production continued to decline thereafter. The volume of gas decreased each year, and no oil was produced in 2013 or 2014. There was a loss in 2014, even with the decision to report decreased operating expenses.
{¶ 83} As the trial court observed, production for 2015 was low as well. Mr. Paulus testified at the February 23, 2016 trial that in the months prior to trial, the well was barely producing. He said a Beck employee told him the well was "dead" on January 21, 2016. (Tr. 76). Still, the final piece of testimony presented by Mr. Paulus was this employee's statement, "I'm going to shut everything off, and hopefully it will recover enough that we can start the motor to pump the well." Appellant's attorney did not follow up by asking questions on the results of this procedure or offer reassuring testimony as to the state of the well at the time of trial.
{¶ 84} The trial court's judgment entry notes the detailed records beginning with the first year of production in 2007 and states, "For the first several years, the evidence shows that the well yielded income beyond its operating expenses." Thus, the trial court did consider the evidence presented for all years and used it to emphasize the decline in production. Appellant believes the trial court focused too narrowly on the time period between 2012, 2013, and 2014. Appellant demonstrates a profit by using the pure mathematical numbers for 2007 through 2014. Appellee urges the figures from this far into the past should not be used to mask evidence of less than profitable current production. Appellee also points to the evidence of weak production for 2015, which covered most of the year (through mid-November). The Ohio Supreme Court in Blausey used the figures for the six-year period presented to the trial court for the equation. However, as the Court specifically pointed out, the parties were not contesting "the base period" used by the trial court. Blausey , 61 Ohio St.2d at 266, 400 N.E.2d 408.
{¶ 85} Here, the well was fairly new; the beginning of the time period Appellant promotes was the beginning of production from the well. The first three years resulted in a much higher profit than other years and also higher production. Using the eight years reported in Appellant's chart would show a profit of $6,845.44. Even subtracting for underreported operating expenses and extrapolating the 2015 figures (which suggest a loss for that year), an equation encompassing the entire time proposed by Appellant would still result in a profit. Yet, as Appellee protests, this long of a time frame may not reasonably reflect the current state of the well under the circumstances of this case. The trial court was the fact-finder whose job was to determine the reasonableness of the base period to be used.
{¶ 86} We note if the reasonable time period for the equation began with 2009, the figures discussed above would initially *96 show a profit of $984.42 from 2009 to 2014. However, a similar or higher figure could reasonably be assigned (and subtracted) for internal operating expenses from the services of a salaried employee, which Appellant previously charged to the well but decided to stop accounting for after September 2013. Although not necessary, we note this would not take into account the 2015 figures, which show no better production and even less revenue. Even assuming 2015 resulted in the lowest operating expenses Appellant ever encountered, a loss for the year can be reasonably inferred. The parties agreed to submit the 2015 figures as evidence in the form of Appellant's response to the second set of requests for admissions. (Merely because Appellant could not provide the finalized annual figures in time for the February 2016 trial does not mean the entire year of 2015 must be ignored by the trial court.) We also note the lease was still in its five-year primary term in 2009.
{¶ 87} Considering the totality of the particular circumstances existing in this case, a trier of fact could reasonably begin the time period for the paying quantities equation with 2010, when the lease entered in its secondary term. Using the five-year period of 2010-2014 would render a loss of $551.51. This loss would grow once the unaccounted operating expenses are added and the figures for 2015 (the sixth year) are assigned. Even with the pump replacement excluded from operating costs, the trial court's decision on paying quantities can be upheld for various reasons, including: the losses in 2012 and 2014; the failure to account for internal operating expenses at the end of 2013 (which would have eliminated the $4.47 profit that year); the failure to account for these internal operating expenses thereafter; the decline in production over time; the low production and revenue in 2015; the problems supplying enough gas to Appellee's house; and the lack of gas in January 2016. For the foregoing reasons, Appellant's second and third assignments of error are overruled, and the trial court's judgment finding the lease terminated due to a lack of paying quantities is upheld.
ASSIGNMENT OF ERROR FOUR: DISGORGEMENT
{¶ 88} The second count in Appellee's complaint discussed unjust enrichment and lost opportunity and asked for equitable restitution and disgorgement. This count alleged Appellant received a bonus to which it was not entitled and requested an order disgorging the money Appellant obtained from assigning the deep rights to XTO. Appellant filed a motion to dismiss this count for failure to state a claim upon which relief can be granted. After finding the lease terminated, the court's second judgment entry ruled in favor of Appellee on the second count. The trial court ruled "[a]ny bonus paid by XTO to Beck Energy shall be disgorged." As a result of this holding, Appellant's final assignment of error provides:
"THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND IN FAVOR OF APPELLEE ON COUNT TWO OF THE COMPLAINT FOR UNJUST ENRICHMENT EQUITABLE DISGORGEMENT AND ORDERED ANY BONUS PAID BY XTO ENERGY INC. TO BECK ENERGY CORPORATION FOR THE PAULUS LEASE'S DEEP RIGHTS BE DISGORGED."
{¶ 89} Appellant states Appellee lacked "standing" to assert a claim for the bonus as they are not a beneficiary of the contract entered by Appellant and XTO, i.e. they are attempting to assert a claim on XTO's behalf. (Appellant notes XTO was a party and could assert its own claim.) Appellant *97 emphasizes the plain language of the ¶ 8.1 of the 2011 purchase and sale agreement requiring it to return the proceeds to XTO if the lease was not maintained for five years. Appellant urges the elements of unjust enrichment claims were not established as Appellee did not confer a benefit on Appellant (XTO did) and the circumstances do not show retention of the benefit would be unjust as the assignment and payment were proper at the pertinent time .
{¶ 90} Appellant notes: "The equitable theory of unjust enrichment is not available where the relationship of the parties is governed by an express contract." Sammartino v. Eiselstein , 7th Dist. No. 08 MA 211, 2009-Ohio-2641, 2009 WL 1581186, ¶ 14. See also Hughes v. Oberholtzer , 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954) ("It is generally agreed that there cannot be an express agreement and an implied contract for the same thing existing at the same time."). Appellant concludes Appellee's second count failed because assignment of the deep rights was permitted by ¶ 13 of the Paulus-Beck lease, and the lease produced in paying quantities at the time of the assignment.
{¶ 91} Appellee responds the trial court acted within its discretion in ordering Appellant to disgorge the $616,000 signing bonus it received from Beck, urging: "This bonus money would have otherwise been available had Beck Energy not continued to burden the property with a lease which had ceased to produce in paying quantities. (In fact, the Pauluses missed out on obtaining a bonus exceeding $1 million from Gulfport.)" (Appellee's Br. 31). Appellee places the lost bonus comment in a parenthetical and does not rely on a damages theory other than restitution or disgorgement. We also note Appellee does not mention unjust enrichment in framing disgorgement as the remedy.
{¶ 92} Appellee reviews our Miller v. Cloud case where the trial court ordered disgorgement of royalties (held in escrow) but not the signing bonus, and this court affirmed. Miller v. Cloud , 2016-Ohio-5390, 76 N.E.3d 297 (noting they are separate sticks in the bundle of rights associated with a mineral estate). Appellee then states Miller is distinguishable as it involved the defendant signing a lease over minerals that had been sold to the plaintiff along with the surface years before, whereas this case involved a lessee signing a sublease. Appellant replies its conduct in entering the assignment (which entailed a signing bonus) was not wrongful in any manner and was permissible under the lease which had not yet terminated (even under the trial court's unfavorable decision ordering lease termination). These facts (involving a partial assignment executed by the undisputed lessee at a time before the lease terminated) make a stronger case for not disgorging the signing bonus than in Miller .
{¶ 93} Unjust enrichment is sometimes generally used as the name of a cause of action and is more specifically the third element in a claim for restitution or for quasi-contract, which contains the following elements: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment (i.e., there would be unjust enrichment). See Johnson v. Microsoft Corp. , 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20 (claim for restitution based on unjust enrichment); Hambleton v. R.G. Barry Corp. , 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984) (quasi-contract claim). The purpose of these types of claims is not to compensate the plaintiff for any loss he suffered but to compensate him for the *98 benefit he conferred on the defendant. Johnson , 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791 at ¶ 21.
{¶ 94} Upon applying this law, the Johnson Court ruled in part: "an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." Id. at ¶ 22. As no transaction occurred between the plaintiff and the defendant, the Supreme Court concluded the plaintiff could not establish the defendant retained any benefit to which it is not justly entitled. Id. (the trial court thus properly dismissed for failure to state a claim upon which relief may be granted).
{¶ 95} As Appellant points out, the plaintiff did not confer a benefit on the defendant in the case at bar. Even more, the plaintiff was not entitled to the particular benefit at issue which was conferred on the defendant by a third-party . It is undisputed the lease permitted this assignment of deep rights. The trial court did not find the lease terminated prior to the 2011 assignment of deep rights to XTO. In other words at the time the assignment was executed and the signing bonus was paid, the lease was producing in paying quantities. Appellee does not explain how a subsequent lease termination due to decreased production can retroactively render a proper payment under a valid assignment improper or unjust.
{¶ 96} The fact Appellant may be contractually obligated to repay the money to XTO under a contract (to which Appellee was not a party) does not work in Appellee's favor. For instance, under the facts of this case, XTO would have no obligation to pay any reimbursed signing bonus to Appellee. XTO did not pay the wrong party at the time the payment was made. There were no title issues, and Appellee is not attempting to place itself into Appellant's shoes in the assignment (as was done in Miller under an agreed entry). In addition, Appellant urges the trial court's ruling subjects Appellant to "disgorgement" of the bonus twice (by court order to Appellee and then again to XTO under the terms of purchase and sale agreement for the assignment). This is not a case where deep drilling actually took place after the signing bonus was paid under the assignment, i.e., royalties were not being collected by the lessee under the assignment of deep rights after the lease terminated.
{¶ 97} Lastly, there was no tort cause of action set forth. The complaint sought equitable restitution disgorgement of the $616,000 bonus. Although the complaint mentioned lost opportunity, it did not set forth a claim involving damages. The trial court did not fashion a damages order for lost opportunity, and Appellee does not rely on such a theory on appeal. Notably, the existence and the amount of damages for lost profits must be established by the plaintiff with reasonable certainty. AGF, Inc. v. Great Lakes Heat Treating Co. , 51 Ohio St.3d 177, 181, 555 N.E.2d 634, 638 (1990) (in a breach of contract action for lost profits to a new business), citing Gahanna v. Eastgate Properties, Inc. , 36 Ohio St.3d 65, 521 N.E.2d 814 (1988), syllabus. Mr. Paulus testified he signed a lease with Gulfport which was rejected, but he did not provide information that a signing bonus under a new lease would be unavailable at the time of trial to establish a lost opportunity or an amount thereof.
{¶ 98} In conclusion, disgorgement of the bonus was improper as Appellant was permitted to enter the assignment in 2011. This assignment of error is sustained. The trial court's judgment ordering lease termination is affirmed, but the trial court's *99 judgment ordering disgorgement of the bonus is reversed.
Donofrio, J., concurs.
DeGenaro, J., concurs.

Appellant alternatively states if the court was permitted to look forward at production after the ten-year primary term expired, allegedly in January 2015, there was no evidence presented on a lack of paying quantities. While making certain stipulations at trial, Appellee submitted as evidence Appellant's response to requests for admissions (involving information gathered since the Beck corporate representatives were deposed). Appellant voiced they had no objection to this evidence. (Tr. 12). This evidence suggests a lack of paying quantities for 2015 and will be discussed further in the analysis of paying quantities infra.

The lease used here was the Form G&T (83) lease reviewed by this court in Hupp and by the Supreme Court in State ex rel. Claughus Family Farm .

A contract representing a complete unambiguous statement of the parties' contractual intent is presumed to be an integrated writing regardless of whether there is an integration clause to that effect. Bellman v. American Internatl. Grp. , 113 Ohio St.3d 323, 2007-Ohio-2071, 865 N.E.2d 853, ¶ 10, citing Galmish , 90 Ohio St.3d at 27-28, 734 N.E.2d 782 ("The presence of an integration clause makes the final written agreement no more integrated than does the act of embodying the complete terms into the writing.").

The chart is lacking minus signs for the two instances of negative figures, in 2012 and 2014.

It is mathematically irrelevant whether a court directly subtracts the royalties from gross income or adds the royalties to operating expenses as both entail a subtraction from income.

We note a Fifth District decision attached as an appendix a trial court's entry which stated: "The value attributable to the producers labor is not an operating cost for this computation." The Fifth District upheld the trial court after a cursory review but did not directly review this statement. Cotton v. Upham Gas Co. , 5th Dist. No. 86-CA-20, 1987 WL 8741 (Mar. 6, 1987).

The Pennsylvania Supreme Court does not believe the Ohio Supreme Court established a one-step objective test, observing that once Blausey held the lessee's personal labor should not be included and production in paying quantities was mathematically established, the Court was not required to reach the second stage involving good faith in maintaining a well at less than paying quantities. T.W. Phillips Gas & Oil Co. v. Jedlicka , 615 Pa. 199, 42 A.3d 261 (2012), fn.15. The Jedlicka court noted no test is ever purely objective unless a specific arbitrary time period is prescribed. Id. at 221-22, 42 A.3d 261.