[Cite as *Fox v. Positron Energy Resources, Inc.*, 2017-Ohio-8700.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| STEVEN T. FOX, | : | Case No. 17CA2 |
| | : | |
| Plaintiff-Appellant, | : | |
| | : | DECISION AND JUDGMENT |
| vs. | : | ENTRY |
| | : | |
| POSITRON ENERGY RESOURCES, | : | |
| INC., ET AL., | : | |
| | : | |
| Defendants-Appellees. | : | **Released: 11/15/17** |

APPEARANCES:

James R. Addison Co., L.P.A., Marietta, Ohio, for Appellant.

John E. Triplett, Jr., Theisen Brock, L.P.A., Marietta, Ohio, for Appellees.

McFarland, J.

{¶1} Steven T. Fox appeals the journal entry entered December 14, 2016 in the Washington County Court of Common Pleas, whereby his amended complaint to terminate an oil and gas lease was dismissed with prejudice. In the first assignment of error, Appellant asserts the trial court erred as a matter of law in failing to apply the implied covenant to conduct operations affecting his royalty interest with reasonable care and due diligence. In the second assignment of error, Appellant asserts the trial court erred as a matter of law in failing to apply the implied covenants to protect the lease from drainage and to explore further and

reasonable development. Appellant's third assignment of error challenges the trial

court's finding that Appellant was required to give 10 days' written notice of

failure to pay shut in payments, before filing his complaint to terminate the lease.

Having reviewed the record, we find the trial court's factual determination is

supported by competent, credible evidence. Accordingly, we find no merit to

Appellant's assignments of error and hereby affirm the judgment of the trial court.

FACTS

{¶2} Appellant is a resident of Tennessee. Appellant's parents owned real

property in Salem Township, Washington County, Ohio. He has experience

working on oil and gas wells and has taught classes in oil and gas drilling and in

the operations of oil and gas wells. Appellee Positron Energy Resources, Inc., is

the owner of the deep well at issue in this case. Appellee Stonebridge Operating

Co., LLC, is the operator of the subject well.[1]

{¶3} In 1972, Appellant's parents granted a lease for the oil and gas mineral

rights below the Berea Sand Formation. This leased tract of land was 113 acres.

One well, the Bartlett-Fagg well, was drilled subject to the first lease. The Bartlett-

Fagg well was drilled to a depth of 4,011 feet from the surface, and is considered a

deep well.

---

[1] Numerous other parties and entities were named as party-defendants in the trial court proceedings, by virtue of having an interest in the royalty payments. None of the additional party-defendants filed answers or appeared in the underlying proceedings.

{¶4} In 1978, a second lease, on a 116-acre tract, was granted by Appellant and his mother, now deceased. One well was drilled on the second lease. In 2000, Appellant and his mother deeded 29.803 acres of their property to Ernest and Shelby Farkas. Both wells are on property which Appellant and his mother deeded to the Farkases. However, Appellant's land is subject to the aforesaid leases.

{¶5} The wells are in close proximity. Appellant owns 86.357 acres of both original tracts. He seeks cancellation of the leases only as to the property he owns. The well pursuant to the second lease is not at issue in this case.

{¶6} On April 3, 2014, Appellant filed a complaint seeking a declaratory judgment that the first oil and gas lease terminated due to breach of implied covenants to reasonably develop, explore, and conduct all operations affecting Appellant's royalty interest with reasonable care and due diligence. In the alternative, Appellant sought a partial horizontal forfeiture of the lease. The parties engaged in written discovery and motion practice. The trial court found genuine issues of material fact precluded summary judgment.

{¶7} On October 26, 2016, the parties presented evidence at a bench trial. On December 14, 2016, the trial court issued a journal entry dismissing Appellant's complaint. The trial court stated it could not find a preponderance of evidence to support the allegations of the complaint.

{¶8} This timely appeal followed.  Where pertinent, additional facts will be set forth below.  Appellant requests the trial court decision be reversed and the first lease terminated for breach of the implied covenants. In the alternative, Appellant requests a partial horizontal forfeiture of the first lease.

## ASSIGNMENTS OF ERROR

"I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO APPLY THE IMPLIED COVENANT TO CONDUCT ALL OPERATIONS THAT AFFECT APPELLANT'S ROYALTY INTEREST WITH REASONABLE CARE AND DUE DILIGENCE.

II. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO APPLY THE IMPLIED COVENANTS TO PROTECT THE LEASE FROM DRAINAGE, TO EXPLORE FURTHER AND REASONABLE DEVELOPMENT.

III.  THE TRIAL JUDGE ERRED IN FINDING APPELLANT WAS REQUIRED TO GIVE 10 DAYS WRITTEN NOTICE TO APPELLEES OF FAILURE TO PAY SHUT IN PAYMENTS BEFORE FILING HIS COMPLAINT TO TERMINATE THE LEASE."

## A. STANDARD OF REVIEW

{¶9} Here, the parties presented evidence in a bench trial in which the trial court sat as trier of fact.  In ordinary civil actions with issues of fact, an appellant contesting the resolution of factual issues can argue the decision was contrary to the manifest weight of the evidence. *Paulus v. Beck Energy Corp*., 2017-Ohio-5716, -- N.E.3d --, ¶ 16.  If an underlying factual determination in a declaratory

action was supported by competent credible evidence, it will not be reversed on appeal. *See, e.g., Shemo v. Mayfield Hts.,* 88 Ohio St.3d 7, 10, 722 N.E.2d 1018 (2000), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984) (every reasonable presumption must be made in favor of the judgment and findings of fact); *Erie Ins. Group v. Fisher,* 15 Ohio St.3d 380, 383-384, 474 N.E.2d 320 (1984), citing *C.E. Morris Co. v. Foley Construction Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus (judgments supported by competent, credible evidence going to the material elements of the case will not be disturbed as being against the manifest weight of the evidence).

{¶10} Weight of the evidence concerns the inclination of the greater amount of credible evidence offered at trial to support one side of the issue over the other; it relates to persuasion and involves the effect of the evidence in inducing belief. *Paulus, supra,* at ¶ 17; *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 19 (applying *Thompkins* to civil cases), citing *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).  In conducting a manifest weight of the evidence review, the reviewing court is to weigh the evidence and all reasonable inferences to be drawn therefrom, consider the credibility of witnesses, and determine whether in resolving evidentiary conflicts, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *See Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶11}** "In weighing the evidence, the court of appeals must always be

mindful of the presumption in favor of the finder of fact." *Paulus, supra,* at ¶ 18.

Finally, if an appellate court finds the judgment rendered after a civil bench trial

was contrary to the manifest weight of the evidence (and does not find any other

prejudicial error in the briefed assignments of error), the appellate court can either

weigh the evidence and render the judgment the trial court should have rendered or

remand the case to the trial court for further proceedings. App.R. 12(C)(1).

### B.   LEGAL ANALYSIS

1.  Did the trial court err as a matter of law in failing to apply the implied covenant
to conduct all operations that affect Appellant's royalty interest with reasonable
care and due diligence?

**{¶12}** "Since the 1800s, courts have recognized the existence of implied

covenants in oil and gas leases." *Alford v. Collins-McGregor,* 4th Dist. Washington

No. 16CA9, 2016-Ohio-5082, at ¶ 15 (Appeal accepted for review, 148 Ohio St.3d

1425, 71 N.E.3d 297 (Table), 2017-Ohio-905), quoting, *Yoder v. Artex Oil Co.,* 5th

Dist. Guernsey No. 14CA4, 2014-Ohio-5130, ¶ 45, citing Hall, *The Application of*

*Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New,* 32 Energy &

Min.L.Inst.  "[A]n implied covenant can only be construed in a lease if there are no

express provisions to the contrary," and "[w]here the lease specifies that no

implied covenant shall be read into the agreement, an implied covenant to develop

* * * cannot be imposed." *Bohlen v. Anadarko,* 2014-Ohio-5819, 26 N.E.3d 1176

(4th Dist.), at ¶ 32. *See Hupp* v. *Beck Energy, Corp.,* 2014-Ohio-4255, 20 N.E.3d 732, at ¶ 115, and cases cited therein.  As Appellees have not directed us to express language in the parties' lease disclaiming implied covenants, we proceed to analyze the facts and circumstances of this case, in light of the evidence the parties presented at trial.

{¶13} In his brief, Appellant argues that, based on his observation and examination, the well at issue was not operated with reasonable care and due diligence in order to maximize gas production.  The trial court construed the central issue for his determination as whether there had been continuous production in paying quantities.  In *Bohlen v. Anadarko, supra,* at ¶ 28, we discussed the term "paying quantities" as follows:

> "The term 'paying quantities,' when used in the habendum clause of an oil and gas lease, has been construed by the weight of authority to mean 'quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss.' " *Blausey v. Stein,* 61 Ohio St.2d 264, 265–266, 400 N.E.2d 408 (1980), quoting Annotation; *Gardner v. Oxford Oil,* 2013-Ohio-5885, 7 N.E.3d 510, ¶ 37 (7th Dist.). We have previously held that "[s]uch language indicates it is for lessee to determine if a profit is being generated above the amount of operating expenses. The amount of royalties paid has no relevancy as to whether a well is actually 'producing in a paying quantity.' " *Siley v. Remmele*, 4th Dist. Washington No. 86 CA 6, 1987 WL 7585, *3. * * * "[T]he construction of the phrase 'paying quantities' must be from the standpoint of the lessee and [its] 'good faith judgment' that production is in paying quantities must prevail." *Hupp,* 2014-Ohio-4255, 20 N.E.3d 732, at ¶ 103, quoting *Cotton,* 1987 WL 8741, at *1; *see also*

*Litton v. Geisler,* 80 Ohio App. 491, 496, 76 N.E.2d 741 (4th Dist.1945) * * *."

{¶14} At trial, Appellant testified he became involved in the drilling of oil and gas wells when he was a teenager. By his twenties, he was engaged in work including well completion, casings, cement placement, well logging, perforating, and fracking. Appellant was hired by Hocking State College to teach oil and gas well drilling and production. He actually utilized a working rotary rig on the campus of the college, physically drilling wells with student help, as well as classroom teaching. Appellant testified he had instructed the drilling and completion of wells in seminars. His experience with deep wells is in Ohio, Texas, Oklahoma, and Kansas, dating back to the mid-1970's.

{¶15} The trial court accepted Appellant as a qualified expert witness pursuant to Evid.R. 702 in the field of drilling and completing oil and gas wells. Appellant introduced several photographs of the well that was drilled pursuant to the first lease, the Bartlett-Fagg well. He provided opinions as to what the photographs represented. On appeal, Appellant directs our attention to the following exhibits:

Appellant's Exhibit 11- a drip tank

Appellant's Exhibit 12- a condenser tank

Appellant's Exhibit 13- a main valve coming out of the wellhead

Appellant's Exhibit 14- a conductor pipe

{¶16} Appellant testified Exhibits 11, 12, and 13 were photographs of the well taken by him at Thanksgiving, 2013. Regarding Exhibit 11, Appellant testified that any gas flowing out of the pipe would be flowing into the atmosphere:

> "It looks like it shows a drip tank. There's a rise, a one inch steel riser pipe it looks, coming out of that with open valves, going in and out, and the pipe coming up has nothing on it. It's just open to the air. The other valves are open, which would tell me that any gas coming into that would be flowing out of that orifice. * * * And if you look at the other valves, there's three you can see closely, they're all open, in the open position."

{¶17} Regarding Exhibit 12, Appellant testified the photograph depicted additional plumbing that was open to the atmosphere. Appellant stated:

> "There's a- - another - - a condenser tank, another valve. The top valve in the center of the photo is clearly in the open position, and you can follow the piping over to the meter and then out of the meter and through an open pipe on the other side."

Appellant further explained that any gas being produced by the well would come out of the open place. He further described the absence of a separator at the site: "Well, gas and oil, you would have a separator there on the site. * * * To separate any oil from gas or fluids that come up out of the well." When asked whether at the time the photograph was taken, "If there was any gas being produced, this would show it's not connected to a line, is that right?" Appellant responded: "It doesn't appear that way to me."

{¶18} Appellant also discussed Exhibit 13 as follows:

"The main valve, coming out of the wellhead, the four-and-a-half inch
casing, to a two inch swedge, (sic) there's a valve there that's clearly
closed and the handle's been removed.  And also, right next to it, on
the discharge side, there's another two inch ball valve and the
handle's been removed and it's in the off and closed position. * * *
No gas can come out of the well, with those valves closed."

{¶19} To further support his contentions, Appellant submitted Exhibit 14, a

photograph of the well drilled on the first lease, taken in September 2016.

Appellant testified as follows:

"I'd like to point out the eight-and-five-eighths surface casing, which
is visible above- - just above the conductor pipe, is rusted almost
completely through.  Heavy corrosion there that will eventually turn
into an environmental problem if it's not addressed."

{¶20} Appellant concluded his testimony, indicating that from the year 2000

to the date he filed his complaint in 2014, the condition of the wells was as his

testimony provided and his photographs depicted.

{¶21} At trial, Appellees' countered Appellant's evidence with the

testimony of John Schneider, a petroleum engineer for Appellee Stonebridge.

Schneider's work for Stonebridge is in engineering and field operations.  He is in

charge of pipeline and production operations.

{¶22} Schneider testified he studied petroleum engineering at Marietta

College and holds a degree.  He has worked as a petroleum engineer for over 20

years, except during a "down-turn" in the industry between 1987 through 1994.

Schneider owns 21 of his own wells and has "hands on" experience.  The trial

court accepted Schneider as an expert in drilling, recompleting wells, setting up production facilities, and maintaining wells and pipelines.

{¶23} Generally, Schneider testified as to the operational status of the wells at issue. He testified he was familiar with both free-flowing wells. The Bartlett-Fagg well produces from the Devonian Shale (Ohio Shale). The wells are "a short walk" apart. Schneider identified Appellees' Exhibit H, a service record of routine maintenance work performed on the Bartlett-Fagg deep well. He testified to his knowledge, it produced only gas, not oil. He also identified Appellees' Exhibit I, a service record for the shallow well. That record indicated typical day-to-day maintenance.

{¶24} Schneider testified both wells flowed through a combined meter, known as a lease meter. The wells eventually moved upstream into a gathering system to a sales point. He testified the deep well is a "pretty decent producer." Nothing in the documentation or other evidence suggested to him that the well had not been in production for the last 5-6 years or had not been selling gas for 5-6 years.

{¶25} Eddy Biehl also testified on behalf of Appellees. He is employed by Stonebridge as a manager and serves as custodian of their records, including records acquired from previous companies. Biehl was also qualified as an expert in the gas and oil industry, and specifically in production operations.

{¶26} Biehl's education and experience were also extensive. Biehl testified he is a geologist and has worked as a pumper, worked on a rig, and he has supervised drilling completions and productions. Biehl holds a bachelor's degree from Harvard in geological sciences with a major in economic geology. Biehl also serves on various local, state, and national organizations, in committee and board positions, developing and promoting better safety measures in the oil and gas industry. Biehl is often called upon as a consultant to offer perspective on the industry in Appalachia. He has served on the Ohio Oil and Gas Association and was appointed by Ohio's governor in the late 1980's to the Oil and Gas Regulatory Review Commissions. He has presented for the Department of Energy in Washington D.C.

{¶27} Biehl testified at one time, there was a separate meter for the deep well. When Columbia Gas, who had a previous interest in the wells, filed bankruptcy, the meter was shut-off. As Schneider had testified, Biehl also explained the Bartlett-Fagg deep well was tied into the same branch of the gathering line as the shallow well.

{¶28} Biehl opined, to a reasonable degree of scientific certainty, that the deep well had economically produced during the entire time of operation. He further testified there is a whole range of production methods and an operator determines what is best, based on the actual well. Biehl's testimony conflicted

with Appellant's, as to the need for an apparatus called a pump jack. Appellant had testified there was no pump jack on either well, which caused him speculation as to whether oil could be produced. However, Biehl testified there was nothing to justify installing a pump jack. Biehl explained here, the prior production method actually reduced the amount of production. Therefore, Stonebridge removed the pump jack and actually improved the well performance.

{¶29} Biehl further testified that the well produced in paying quantities and had done so the entire time Stonebridge operated it. Based upon his review of prior records, the well had also produced in paying quantities prior to that time. Biehl testified he had analyzed state records as to production levels for similar shale wells as to the Bartlett-Fagg well. He testified the Bartlett-Fagg well was in the upper half of performance for similar Devonian Shale wells in the State of Ohio.[2]

{¶30} On cross-examination, Biehl admitted he had never done an analysis of the income on the deep well versus the cost of maintaining the well. Biehl was also asked about work done on the well in October 2016, approximately 3 weeks prior to trial. Biehl explained that when he reviewed Appellant's sworn affidavit that the well was full of water, he became concerned and wanted to verify the status of the well. In doing so, he learned the well was not full of water. However,

---

[2] Biehl identified Defendant's Exhibit N, a production graph for the Bartlett-Fagg No. 1 well. The graph was based upon reported production in the field, maintained on a weekly basis, to show well performance. The graph was based upon the records of the Stonebridge Biehl personally maintained.

while the wellhead was torn apart, he went ahead and re-plumbed it and installed

flow meters on it in order to visually check it more easily. He testified the work

done had no effect on well production.

{¶31} Appellees argue the evidence presented supported the trial court's

findings of lack of breach of the implied covenants. We agree. The trial court

found:

> "The Plaintiff is concerned about the lack of certain production
> fixtures at these well sites. In fact, these are solely gas wells and do
> not produce oil. When Columbia Gas went bankrupt to get out from
> under these leases and similar leases on other wells, the Defendant
> tied these two wells together and then fed the gas into one of the
> Defendant's pipelines. The Defendant's pipeline has a compressor on
> its line so the gas from these and other low pressure wells can flow
> freely into its line. This compressor reduces the line pressure. The
> wells are metered where they go into the line, not at the well head.
>
> The Defendants' records show that maintenance has been performed
> on these wells. Both of the Defendants' witnesses have extensive
> education, experience and training in all aspects of the oil and gas
> industry. They belong to numerous professional organizations. As
> noted above, these are free flowing wells. They are tied into each
> other. There is old plumbing on the wells that has never been
> removed. Since the Columbia bankruptcy they have flowed through
> one meter. The Defendants checked the corporate records prior to
> purchasing these wells and those records showed continuous
> production. The State of Ohio's records are incomplete. Some
> records have been lost and some were disposed of because they
> blocked a fire exit. These wells are in the top 50% of the Defendant's
> wells in production and profitability. They cost little to operate."

{¶32} In his brief, Appellant also asserts there was no economic benefit to

him from the two wells. At trial, Appellant offered Defendant's Exhibit M, a

composite of copies of returned royalty checks. Essentially, Appellant testified the wells had never been profitable in any way. He denied receiving royalties from the Appellees in 16 years. However, he acknowledged his mother, who died in 2008, may have received royalties.

{¶33} At trial, Appellees also disputed Appellant's assertion regarding the royalty payments, pointing to evidence of payment and Appellant's correspondence with Appellees to insure payment after Appellant's mother's death. On cross-examination, Appellant was confronted with several exhibits compiled by Appellees: F, G, and J. Appellant identified and acknowledged:

> 1) Exhibit F, a 2008 letter from him to Jennifer Duty, an employee of Stonebridge. The letter advised Stonebridge to send royalty checks "if there are checks" to his mother to avoid "check endorsement complications";
>
> 2) Exhibit G, correspondence to Jennifer Duty, advising that his mother had died and providing a death certificate; and,
>
> 3) Exhibit J, a group of documents of correspondence to Stonebridge, including a tax form he signed. He acknowledged the purpose of the tax form was "probably for taxes on production."

{¶34} However, after identifying the documents, Appellant continued to maintain he did not remember receiving royalty checks from Stonebridge and did not remember giving his attorney royalty checks to return to Stonebridge, although it could have happened.

{¶35} Biehl provided additional testimony as to the royalty issue. Biehl identified Appellees' Exhibit M, a letter from Appellant in September 2013 returning 6 royalty checks for production and royalties off the Bartlett-Fagg deep well. Biehl testified Stonebridge had mailed royalty checks to Appellant from 2010 until the ones returned in 2013. He testified quite a number of checks were sent and all but one were cashed. Biehl also identified Appellees' Exhibit E, a request of change of payee from the estate of Laura Bartlett to Appellant in 2010.

{¶36} Appellees argue the record was sufficient to support a finding that Appellant derived economic benefit from the wells. We agree. On this issue, the trial court found:

> "The Plaintiff asserted in his testimony in his case in chief that he had not received royalty checks in the last 16 years. This testimony was not supported in other testimony given in this case. * * * In fact, the Plaintiff has no knowledge of what monies his mother got under these leases. When his father died he had all checks sent to his mother, including those for his interest in these leases. * * * There are gaps in the Plaintiff's knowledge of past production and royalty payments. He admits he doesn't know what was and wasn't paid to his mother."

{¶37} In conclusion, the trial court heard conflicting evidence and found that the well at issue was in production and in proper repair. The trial court also agreed that Appellant derived an economic benefit from the well. We are mindful of the presumption in favor of the finder of fact. In particular, we observe the trial court's comment regarding credibility of the witnesses:

"In the Defendant's final cross examination of the Plaintiff, the Plaintiff admitted that * * * he believed that the testimony on the Defendant's operations manager, Mr. John Schneider, a petroleum engineer, was truthful. The Plaintiff also admitted at trial that the affidavits he submitted in support of his Motion for Summary Judgment in this action were not correct."

{¶38} For the foregoing reasons, we find competent credible evidence supports the trial court's judgment. We do not find the fact-finder clearly lost its way or created a manifest miscarriage of justice necessitating reversal of the judgment. As such, we overrule the first assignment of error and affirm the judgment of the trial court.

2. Did the trial court err as a matter of law in failing to apply the implied covenants to protect the lease from drainage, to explore further and reasonable development?

{¶39} "The most commonly recognized implied covenants are * * * the covenant to reasonably develop, the covenant of further exploration, the covenant to protect against drainage, * * *." *Collins-McGregor, supra,* at ¶ 15, quoting *Hall, supra.* The Supreme Court of Ohio "has long adhered to the principle that absent express provisions to the contrary, a mineral lease includes an implied covenant to reasonably develop the land." *Ionno v. Glen–Gery Corp.,* 2 Ohio St.3d 131, 132, 443 N.E.2d 504 (1983). Forfeiture of an oil and gas lease may be an appropriate remedy, under limited circumstances, for a breach of an implied covenant. *Hoop v. Kimble,* 7th Dist. Harrison No. 14 HA 9, 2015–Ohio–2110, ¶ 15.

{¶40} While Appellant has set forth the implied covenant to protect from drainage, there was conflicting testimony, as set forth above, regarding this issue. Appellant has failed to develop this argument. Appellant's argument hereunder has focused on the implied covenants to explore further and to reasonably develop. We begin by consideration of the applicable law cited by Appellant.

{¶41} In his brief, Appellant cites various cases in which courts have found forfeiture of a lease to be the appropriate remedy. *Coffinberry v. The Sun Oil Co.,* 68 Ohio St. 488, 67 N.E. 1069 (1903) (Cancellation of the undrilled portion of the premises can be granted if the lessee has failed to drill further and develop or test the undrilled portion of the lease); *Beer v. Griffith,* 61 Ohio St.2d 119, 399 N.E.2d 1227 (1980) (Breach of an implied covenant can forfeit part of a lease if damages are inadequate); *Core v. Samurai,* 2015-Ohio-5437, 55 N.E.3d 449 (7th Dist.) (Where no drilling activity for 22 years on 414 acres of a 515 acre lease, court found lessee had breached the implied covenant to reasonably develop.) Appellant argues the lease covered 113 acres and only one well was drilled, on the acreage no longer owned by him. Appellant also argues he is not even entitled to royalties from the well. Appellant concludes that forfeiture or cancellation of the lease is compelling, in order to do justice.

{¶42} In response, Appellees point out Appellant has neither, in writing or verbally, complained about the lack of development of his property nor requested

further development.  Notably, Appellees interpret Appellant's argument herein as an attempt to compel partial horizontal forfeiture of the deep rights.  Appellees point to Appellant's testimony that he has made an attempt to sever the "deep rights," and to lease the "deep" horizons, ignoring the clear precedent of the *Collins-McGregor* decision, *supra*.  Regarding partial horizontal forfeiture of Appellant's lease, the trial court's decision spoke to the authority of the *Collins-McGregor* decision as follows:

> "There are two leases involved in this case.  At some point in time part of the surface of the subject tract was sold with the mineral rights on that part.  There has been one well drilled pursuant to each lease.  These wells are close in proximity.  Both well heads are physically on the land that was severed and are not on the Plaintiff's land.  However, his land is subject to the aforesaid leases.  Both of these leases are in their secondary terms.  The issue for this Court is whether there has been continuous production in paying quantities.  The Plaintiff now owns 86.357 acres of both the original leased tract of 113 acres on the first lease and 116 acres on the second lease.  He seeks cancellation of the leases only as to the property he owns.  The well on the first lease is a shallow well[3] and was drilled to a depth of 4,011 feet and the well and the second lease is simply referred to as a "shallow well."
>
> The shallow well that was drilled pursuant to the second lease is not at issue in this case.  The Defendant seeks either a forfeiture of the first lease with the deep well or a partial horizontal forfeiture of that lease.  Ohio law does not permit partial horizontal lease forfeitures. *Alford v. Collins-McGregor Operating Co., et al.,* 16CA9, Fourth District Court of Appeals for Washington County, Ohio (7/15/16)."

{¶43} In *Collins-McGregor,* as Appellant points out, we observed: "[w]here

---

[3] Our review of the transcript and testimony indicates the well on the first lease, the Bartlett-Fagg well, was repeatedly referenced as a deep well.  It appears the trial court may have simply misspoken, in light of the court's reference later in the entry as to "forfeiture of the lease with the deep well."

legal remedies are inadequate, forfeiture or cancellation of an oil and gas lease, in whole or in part, is an appropriate remedy for a lessee's violation of an implied covenant." *Beer* at paragraph four of the syllabus; *see also Core v. Samurai Corp.,* 2015–Ohio–5437, 55 N.E.3d 449, ¶ 14 (7th Dist.). Consequently, depending on the facts and circumstances, the remedy of partial forfeiture of an oil and gas lease may be an appropriate remedy for the breach of an implied covenant. *Collins-McGregor, supra,* at 17.[4]

{¶44} In *Collins-McGregor,* we observed that none of the cases cited by the landowners addressed the availability of partial forfeiture as a remedy for horizontal, as opposed to vertical, property. And the landowners' action in *Collins-McGregor* expressly sought relief declaring that the depths below the Gordon Sand formation were unencumbered by the oil and gas lease because of the lessees' breach of the implied covenants to reasonably explore and develop that horizontal portion of the leasehold. In *Collins-McGregor,* we relied upon an earlier decision of our own district, *Marshall v. Beekay Co.,* 2015–Ohio–238, 27 N.E.3d 1 (4th Dist.).

---

[4] In *Collins-McGregor,* we cited *Beer,* wherein the Supreme Court of Ohio affirmed the partial forfeiture of an oil and gas lease for a lessee operating only one well on a 150–acre leasehold because of a breach of the implied covenant to reasonably develop the land. The Supreme Court held that the lessee's breach forfeited all but the 40–acre tract associated with its producing well. In light of significant further efforts necessary to develop the resources and the amount of unexploited acreage, the trial court reasoned the lessee's financial and operating difficulties would render a mere damage award inadequate; thus "forfeiture of lessee's interest is warranted in order to assure the development of the land and the protection of lessor's interests." *See Beer, supra,* at 61 Ohio St.2d at 122, 399 N.E.2d 1227.

{¶45} In *Marshall, supra,* the landowners sought the partial horizontal termination of the deep rights of oil and gas leases based on the lessees' failure to produce oil or gas in areas below the Germantown Sand formation, notwithstanding the continued production of 15 shallow wells. Based upon several cases, including *Popa v. CNX Gas Co., LLC,* N.D. Ohio No. 4:14CV143, 2014 WL 3749415 (July 20, 2014), and *Clark v. Wolfcale,* 5th Dist. Ashland No. CA–648, 1977 WL 201058 (June 2, 1977), we held there was "no authority" to support a partial forfeiture of the deep, i.e., horizontal, rights of the leasehold. *Marshall, supra,* at ¶ 21. Importantly, we further held that the deep-rights lessees did not breach the implied covenant to reasonably develop the property because "there was no duty to further develop as long as gas and oil were being found in paying quantities" in the shallow part of the leasehold. *Id.* at ¶ 23.

{¶46} In *Collins-McGregor,* we also looked to the decision in *Clark,* wherein the Fifth District Court of Appeals rejected landowners' attempt to declare an oil and gas lease abandoned horizontally below the Berea Sands formation. The *Clark* court determined that Ohio law had not recognized this type of partial forfeiture or abandonment, stating:

> "What this appeal boils down to is an in genius [sic] attempt to find a way to get out from under an old oil and gas lease which in the light of changed circumstances respecting the price of oil is now economically disadvantageous' [sic] to the land owner. However ingenuously [sic] this argument has been developed and how resourcefully it has been researched and how strenuously it has been

urged, it is totally without support in Ohio law and this court declines to blaze the trail." *Id.* at \*3.

{¶47} In *Collins-McGregor,* we found the *Marshall* decision to be directly applicable. As in *Marshall,* the *Collins-McGregor* lessees' continuous production of oil and gas in paying quantities in the shallow area of the leasehold held the depths below that formation. In *Marshall,* we further observed at ¶ 22:

> "The landowners cite no Ohio case, and offer no persuasive out-of-state authority, for modifying our current precedent to permit the requested partial horizontal forfeiture of oil and gas leases. Our own limited legal research reveals that this is a complex, evolving issue with no easy answer. See Burford, Legal Issues Involving Private Rights in Appalachia, 12 E.Min.L.Found. Section 21.04 (1991)."

{¶48} In this case, Appellant does seem to ignore his own testimony regarding his request for partial horizontal forfeiture of the lease. Appellant testified that "a couple different companies" approached him regarding the right to deep lease. He later testified he was approached by "three or four different companies on the phone that called me," but he did not recall the names of persons or companies he may have talked to.

{¶49} In *Collins-McGregor,* we found current precedent did not recognize the availability of partial horizontal forfeiture of oil and gas rights in Ohio, and an absence of authority to the contrary. Furthermore, we are mindful of the importance of the facts and circumstances of each case. The cases Appellant cites in his brief may be distinguished in that they either involved a finding that implied

covenants had been breached, or a finding that the subject wells had failed to produce in paying quantities.

{¶50} As previously discussed, we have found competent, credible evidence to support the trial court's judgment that the well at issue was producing in paying quantities. As such, we also agree with the trial court's reliance upon our decision in *Collins-McGregor.* Accordingly, we find no merit to Appellant's second assignment of error. It is hereby overruled.

3.  Did the trial judge err in finding Appellant was required to give 10 days' written notice to Appellees of failure to pay shut in payments before filing his complaint to terminate the lease?

{¶51} Ordinarily, the third assignment of error challenging the trial court's finding  that Appellant was required to give 10 days' written notice to Appellees of failure to pay shut in payments before filing his complaint, would be a threshold issue which we would find dispositive. However, the thrust of the trial court's decision in favor of Appellees was that Appellant failed to prove the well at issue was non-producing. The trial court's finding that Appellant failed to provide written notice was "an additional basis," for dismissal of Appellant's complaint.

{¶52} The notice requirement arises from certain language in Paragraph 3 of the parties' lease agreement. Interpretation of a written contract is a matter of law requiring de novo review. *Alford V. Collins-McGregor Operating Co., supra,* at ¶11; *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 14,

quoting *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452. Our role is to ascertain and give effect to the intent of the parties, which is presumed to lie in the contract language. *Arnott,* at ¶ 14. In our context, "[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument" and "[s]uch leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." *Collins-McGregor, supra,* at ¶ 12, quoting *Harris v Ohio Oil Co.,* 57 Ohio St. 118, 129 58 N.E. 502 (1897); *Bohlen, supra*, at 13.

{**¶53**} Here, unfortunately, Paragraph 3 containing the shut in clause is extremely difficult to read. The parties appear to agree that the language of the shut in clause provides that if the lessor has not been receiving payment for non-production, lessor has to provide written notice by registered mail, 10 days prior to filing suit.[5] Appellant argues that he was not obligated to give the required notice because there is no evidence in the record indicating a lack of transmission facilities requiring Appellees to make shut in payments. Appellees point to Appellant's admission that he demanded no payments of any kind, despite evidence that he corresponded with Appellees frequently over other issues.

{**¶54**} The trial court found:

---

[5] Williams, Oil and Gas Law, Vol. 8 Manual of Terms, defines a shut in well as a producing well that is closed down. *See Gelb. v. Santa Fe Drilling Co.,* 4th Dist. Washington No. 83X3, 1984 WL 4285, (Mar. 30, 1984), *2.

"Additionally, the lease at question (the deep well) contains a provision that the lessor (i.e. the Plaintiff) make a demand for delay or shut in payments if the lessor objects to an issue of payment. The Plaintiff offered no evidence that such a demand was ever made."

**{¶55}** Appellant admitted he never gave written notice. The trial court found the well at issue was in its secondary term and was producing in paying quantities. Given the trial court's findings that Appellant's lease was not forfeited for lack of production, the notice provision applied. And, Appellant admitted he did not provide notice. Therefore, the trial court did not err in its finding that Appellant failed to give requisite notice prior to filing his complaint. Accordingly, we find no merit to Appellant's third assignment of error and it is hereby overruled. As such, we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellants any costs herein.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, J.:  Concurs in Judgment and Opinion.
Harsha, J.:  Concurs in Judgment Only.


For the Court,


BY:  _____
Matthew W. McFarland, Judge


**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**