# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| 2900 INVESTMENTS, LLC, | : | APPEAL NO. C-240514 |
| | | TRIAL NO. A-2300729 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| DEANDRA JEBRIL, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed 75 percent to appellant and 25 percent to appellee.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 7/9/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *2900 Invests., L.L.C. v. Jebril*, 2025-Ohio-2424.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| 2900 INVESTMENTS, LLC, | : | APPEAL NO. C-240514 |
| | | TRIAL NO. A-2300729 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| DEANDRA JEBRIL, | : | |
| Defendant-Appellant. | : | |


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: July 9, 2025


*Thomas H. Bergman & Assoc., LLC*, and *Brian Leurck*, for Plaintiff-Appellee,

*Wood & Lamping LLP*, *Kathleen F. Ryan* and *Hanna R. Puthoff*, for Defendant-Appellant.

**ZAYAS, Judge.**

**{¶1}** Defendant-appellant Deandra Jebril appeals from the judgment of the Hamilton County Court of Common Pleas declaring a valid and enforceable prescriptive easement over a portion of her property at 2916 Gilbert Avenue. For the reasons that follow, we overrule Jebril's arguments pertaining to the evidence establishing the easement and sustain Jebril's argument pertaining to the trial court's description of the easement in the judgment entry. As a result, we remand the cause for the trial court to include a sufficient description of the easement in its judgment entry, as further explained below.

## I.    *Procedural History*

**{¶2}** In February 2023, plaintiff-appellee 2900 Investments, LLC, ("2900") filed suit against Jebril, seeking a declaratory judgment in favor of a prescriptive easement. The complaint claimed that 2900 must access Jebril's property at 2916 Gilbert Avenue ("Jebril's property") to enter, park, and exit from its property at 2902 and 2910 Gilbert Avenue ("the 2900 property"), and a dispute arose regarding the "rights, status, and legal relationship between the parties arising from the property line, specifically the entrance, exit and parking areas." 2900 claimed that it has owned the 2900 property since April 3, 2003, and that 2900 and its predecessors in interest have openly and continuously used Jebril's property for access to and from the 2900 property and parking since "at least 1990, approximately 33 years."

**{¶3}** The matter proceeded to trial in July 2024. In advance and for the purpose of trial, the parties submitted a joint stipulation of facts and exhibits. The stipulated facts established the ownership history of each property. Further, 2900 presented the testimony of several witnesses in its favor at trial. Jebril did not present any witnesses or evidence at trial. After written closing arguments, the trial court

issued an order granting 2900's motion for a declaratory judgment in favor of a prescriptive easement. More specifically, the court declared "that a valid, enforceable easement over the parcel of property, subject to this lawsuit only, is awarded to [2900]. [2900], from the date of this entry forward[,] is entitled to the quiet use and enjoyment of the easement without undue interference by [Jebril]."

{¶4} Jebril now appeals, asserting a single assignment of error in which she argues that the trial court erred in finding a prescriptive easement.

## II. Facts

{¶5} 2900 is composed of two members. One of the members ("Member A") is one of the original founders of the Giminetti Baking Company ("Giminetti"). He testified that Giminetti moved into the 2900 property in 1990 under "a purchase contract" with the previous owner and exercised the option to buy the property in 2003. Giminetti was "a wholesale bakery baking company," with a retail cafe bakery in part of the front area, that was in operation until 2023, when the business (not the property) was sold. The property is now leased to a school.

{¶6} Member A testified that the 2900 property has a parking lot and stated that, to get to the parking lot, customers and employees utilized the curb cut that comes across Jebril's property to access the parking spaces. The curb cut is the only access to the parking lot. The bakery was open six days a week to customers, and employees were at the bakery seven days a week.

{¶7} Member A utilized joint exhibit XI—a survey map from the Hamilton County Auditor exhibiting property boundaries—to point out the area at issue. He testified that the yellow area on the map is the 2900 property, the blue area is Jebril's property, and the pink area is "what we are here today talking about." The curb cut is "right on the front of the pink area."

**{¶8}** When asked to explain what "the parking lot" was used for, Member A testified,

> For numerous -- we have -- at one time, we used to deliver for all the Burger Kings in the Tristate region. So we had leased trucks we used. We had six of them at that time, in addition to our bakery trucks that we would have to park on that property at night. And then, of course, the drivers would replace their car with the truck when they went out on the routes.

> Also, when we opened the restaurant, that was the only parking for our customers to use. So we were very protective of that property just to make sure we can use it for our parking, and make sure we had access to it.

**{¶9}** Member A said that the "strip of land we're talking about" was previously owned by a gentleman who had a pharmacy and medical building "on that property at one time." Member A denied ever having entered into any agreement with the previous owner or getting oral permission to use "that parcel." When asked if he used "that parcel" from the day he moved in, he said, "Yes." When asked if the parcel was used for "deliveries, parking, and the curb cut," he answered, "That's correct." He said that the deliveries went from 1990 to 2023. He denied that anyone ever stopped him from using "that parcel." When asked about maintenance to "this parcel," he said, "We took care of the snow removal. We took care of patching blacktop as needed, we did the striping three or four times." When asked if he continuously parked in the parking lot from 1990 to 2023, he answered, "Every day." When asked if he ever tried to hide the use of the parking lot or the parcel in any way, he said, "No, not [at] all." When asked if "things were parked there during the day," he said, "Yes," "every day."

**{¶10}** Member A testified about an incident in 2014, when "Mr. Jebril" owned the property, where a temporary fence was put up that "encroached on the access to our parking spaces." He sent a text to Mr. Jebril to move the fence because it was blocking entry to the parking lot. He did not get a response to the text message, but the fence was moved. He also testified to another incident in 2020 where a chain was put up "across this access on to our property." He said, "we asked him to take it down and he did because it was on our property." He said it was "a one-sided discussion" because he never received responses to the text messages he sent. He denied that the Jebrils ever gave him an explanation for why the fence or the chain went up.

**{¶11}** The second member of 2900 ("Member B") testified that he became Member A's business partner in 1996. In the early 1990s, he worked for Member A delivering doughnuts and bread to all the Thriftway stores. He was also "on the trucks" once they were business partners. When asked about "the parcel in question today" and if he ever used the parcel, he answered, "Yes. We parked our trucks over there when I drove. Then our customers and employees used it up until we shut down the deli." When asked if he always used the curb cut, he said, "Yes. That's the only way into the lot, into our parking spaces." When asked if they were the only business using "that parcel," he said, "Yes." When asked if the parcel was used every day, he said, "Yes." When asked how often he was there when he was driving, he answered, "I would be there at least eight to ten hours a day." This was six days a week. When asked about maintenance and who took care of the "parcel," he said, "We did. We striped it." When asked who he meant by "we," he said, "Giminetti's did." He testified, "We striped it, and we'd salt it, and plow it." They also hired someone to cut the grass. He denied ever having any contact with the Jebrils about the parcel and denied that Giminetti ever tried to hide use of the parcel. When asked if he ever got permission to use the

parcel from any owner, previous or current, he said, "No. We just always used it." He testified that the curb cut was the only entrance to their parking lot and agreed it was used for "customers, delivery, employees, et cetera."

{¶12} A Giminetti employee ("Employee A") testified that she worked for Member A "for many years," and worked for his father before that. She worked at Giminetti for 24 years, from 1993 to 2017. She said that she used the parking lot at the building and there was "one curb" that you could use to get into the parking lot. When asked if she parked there a lot, she said, "Yes, I parked there, customers parked there, we parked our trucks there sometimes." She said they maintained the parking lot yearly "for snow removal, throwing down salt, cutting back weeds." She also agreed that they "striped it." When asked on cross-examination whether they would stripe "the Giminetti parking lot or the adjoining parking lot," she said, "I don't see where there's a difference." When asked where the striping ended, she said, "The striping was pretty much on the side, closest to our building." On redirect, she was asked whether vehicles were parked in "the parcel" that goes straight back from the curb cut, and she said, "Yes. They would parallel park in those spaces." She could not recall for sure if there was a line where they would parallel park.

{¶13} Another Giminetti employee ("Employee B") testified that he worked for Member A from 2008 to 2014, and then again from 2019 to 2020. When asked how one entered the parking lot, he said, "There was an entrance. It was like between two yellow poles, and you just pulled in the entrance." He agreed this was the curb cut. When asked if this was where he parked, he said, "Yes. We typically would park further down to leave the front parking spots for the deli guys." When asked if customers used the parking lot, he said, "Every day." When asked about the strip that "goes straight back" from the curb cut and whether trucks were parked there, he said,

7

I mean, yeah. We would, you know, sometimes we have to park our trucks there, depending on what was going on the side of the street or if we had to clear out our loading dock. You know, we had space there to just pull apart [t]he trucks because there was a two-car garage at the very end that was unused, so being able to pull down towards the end.

{¶14} When asked about joint exhibit XII—an overview photograph of the area—and the "strip here where you see those cars," he testified that this area was used while he worked there for customer parking and "occasionally" for truck parking. He denied ever receiving permission to use that area. He said, "It was never discussed," and added, "That's how we got into the parking lot." When asked about the maintenance of this area, he said it was maintained by the company. He added,

And, I know, personally, when I worked there, I had prior ownership to working for the company, so I put effort into keeping the outside of the building cleaned up, weeded, whatnot. So I would weed and clean that parking lot. I actually painted stripes in that parking lot, I believe two times over the course of the first time I worked there, from 2008 to 2014.

{¶15} He further added, "I, actually, painted even the parallel parking spots." He believed this occurred around 2009 and 2011. He also made sure snow was removed and it was salted.

{¶16} A third Giminetti employee ("Employee C"), testified that he worked for Member A from 1992 to 2008. He said that you enter the parking lot through the curb cut. When asked about the area straight back from the curb cut and what it was used for, he said, "Oh, for parking. That's all I can remember." When asked if customers parked there, he said, "I believe they did. So, for me, I was never really there during

8

the day. I was always out on deliveries. So that was the core hours for customers. But yeah, I believe customers had access to that lot." He testified that he parked trucks there "occasionally." When asked about maintenance of this area, he said the bakery always cleared the snow and took care of the grass. When asked if he ever received permission to use that area, he said, "No, I never had any kind of permission from anyone. I just parked there and no one had ever said you can't park here." He agreed that, during his "entire time there," he would see cars and trucks in that narrow strip of the parking lot next to the grass.

### III.    Law and Analysis

### A.  Standard of Review

**{¶17}** "In a declaratory judgment case, a trial court's decision on justiciability is reviewed under the abuse of discretion standard of review." *Paulus v. Beck Energy Corp.*, 2017-Ohio-5716, ¶ 14 (7th Dist.), citing *Arnott v. Arnott*, 2012-Ohio-3208, ¶ 1. "Thereafter, legal questions are subject to de novo review whereby no deference is given to the trial court's decision." *Id.* at ¶ 15, citing *Arnott* at ¶ 1, 13. "Where the final decision involves factual issues, another standard of review may be implicated." *Id.*

> Pursuant to a specific declaratory judgment statute: "When an action or proceeding in which declaratory relief is sought under this chapter involves the determination of an issue of fact, that issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the action or proceeding is pending."

*Id.*, quoting R.C. 2721.10.

**{¶18}** Thus, when reviewing factual determinations from a bench trial, this court applies the usual sufficiency and manifest-weight standards of review. *See, e.g.,*

9

*id.* at ¶ 16; *Kraynak v. Whitacre*, 2018-Ohio-2784, ¶ 15 (7th Dist.); *Blair v. McDonagh*, 2008-Ohio-3698, ¶ 56 (1st Dist.); *Cincinnati Ins. Co. v. Irwin Co.*, 2000 Ohio App. LEXIS 6045, *7 (1st Dist. Dec. 22, 2000); *City of Westlake v. City of Cleveland*, 2021-Ohio-2929, ¶ 11 (8th Dist.).

### B. *Prescriptive Easements Generally*

**{¶19}** "An easement is an interest in the land of another which entitles the owner of the easement to a limited use of the land in which the interest exists." *Westvaco Corp. v. W. 114th Berea Realty Corp.*, 1994 Ohio App. LEXIS 4633, *7 (8th Dist. Oct. 13, 1994), citing *Szaraz v. Consolidated RR. Corp.*, 10 Ohio App.3d 89 (9th Dist. 1983). "'An easement in or over the land of another may be acquired only by grant, express or implied, or by prescription.'" *Id.*, quoting *Trattar v. Rausch*, 154 Ohio St. 286 (1950), paragraph two of the syllabus. "'Prescription is the acquisition of an easement, over the property of another, through adverse use of that property.'" *Hall v. Dasher*, 2022-Ohio-1735, ¶ 42 (5th Dist.), quoting *Crawford v. Matthews*, 1998 Ohio App. LEXIS 4492 (4th Dist. Sept. 21, 1998).

**{¶20}** "'Prescription, like adverse possession, is effectively, a statute of limitations.'" *Shell Oil Co v. Deval Co.*, 1999 Ohio App. LEXIS 4423, *13 (1st Dist. Sept. 24, 1999), quoting *Crawford*.

> "The principle upon which the limitation operates, is, that the adverse claim is accompanied by such an invasion of the rights of the opposite party as to give him a cause of action, which he has failed to prosecute within the time limited by law, and which he is therefore presumed to have surrendered or abandoned."

*Id.*, quoting *Crawford*.

**{¶21}** "'Prescription is, in essence, a form of adverse possession." *Harris v.*

*Dayton Power & Light Co.*, 2016-Ohio-517, ¶ 12 (2d Dist.), quoting *Crawford* at fn. 6. "'They differ in that prescription grants the adverse user an easement or incorporeal rights in the property, while adverse possession grants the adverse user legal title.'" *Id.*, quoting *Crawford* at fn. 6. "An easement grants permission to use the land of another not the exclusive right to possess it." *Id.* at ¶ 13.

**{¶22}** Thus,

> "[t]he distinction between the elements required to acquire a prescriptive easement and those required to acquire title by adverse possession is limited to the land's exclusive use. Acquiring an easement by prescription differs from acquiring title by adverse possession, in that exclusivity is not an element required to establish an easement by prescription."

*Id.* at ¶ 13, quoting *Vaughn v. Johnston*, 2005-Ohio-942, ¶ 11 (12th Dist.).

**{¶23}** "Under Ohio law, in order to obtain a prescriptive easement, a landowner using adjacent property must prove, by clear and convincing evidence, that such use was open, notorious, adverse to the neighbor's property rights, continuous, and in place for at least twenty-one years." *Hall*, 2022-Ohio-1735, at ¶ 43 (5th Dist.), citing *Williams v. Phillips*, 1999 Ohio App. LEXIS 2693 (5th Dist. June 3, 1999); *accord, e.g., Pinkerton v. Salyers*, 2015-Ohio-377, ¶ 23 (4th Dist.); *Katz v. Metropolitan Sewer Dist.*, 117 Ohio App.3d 584, 589 (1st Dist. 1997).

**{¶24}** "A use is 'adverse' when it is without permission of, and is inconsistent with the rights of, the property owner." *Hall* at ¶ 63, citing *Crawford*, 1998 Ohio App. LEXIS 4492 (4th Dist. Sept. 21, 1998). "'It is not necessary that there be a heated controversy, a manifestation of ill will, or enemy between the parties.'" *Id.*, quoting *Crawford*. "'[Where] one uses a way over the land of another without permission as a

way incident to his own land, and continues to do [so] with the knowledge of the owner, such use is, of itself, adverse.'" *Id.*, quoting *Pavey v. Vance*, 56 Ohio St. 162 (1897). "Any use of the land inconsistent with the rights of the titleholder is adverse or hostile." *Id.*, citing *Kimball v. Anderson*, 125 Ohio St. 241 (1932).

{¶25} "Property is used 'openly' when it is used 'without attempted concealment,' and it is used 'notoriously' when its use is 'known to some who might reasonably be expected to communicate their knowledge to the owner if he maintained a reasonable degree of supervision over his premises.'" *Harris*, 2016-Ohio-517, at ¶ 19 (2d Dist.), quoting *Hindall v. Martinez*, 69 Ohio App.3d 580, 583 (3d Dist. 1990).

### C. Initial Matters

{¶26} We first note that the arguments presented in the appellant's brief appear to be based on a limited portion of the evidentiary record. Cited are (1) an affidavit that her attorney filed in advance of trial that pertained to discovery issues and included certain photographs, and (2) the "Joint Stipulation of Facts and Exhibits" that was filed in advance of trial. However, the attorney affidavit was not referenced or utilized at trial, and only certain exhibits from the stipulated exhibits were actually admitted at trial. Further, no reference is made to joint exhibits XI and XII, two exhibits that were heavily relied upon and admitted at trial. This is significant as Exhibit XI—the survey map—outlines in pink the area over which 2900 was claiming an easement. It is claimed in the reply brief that these exhibits are not a part of the record. However, both exhibits were admitted at trial and were with the trial court exhibit clerk and thus are a part of the record. *See* App.R. 9(A)(1) ("The original papers and exhibits thereto filed in the trial court, the transcript of proceedings, if any, *including exhibits*, and a certified copy of the docket and journal entries prepared by the clerk of the trial court shall constitute the record on appeal in all cases." (Emphasis

12

added.)); *State v. Hendrix*, 2018-Ohio-3754, ¶ 8 (1st Dist.), citing App.R. 9(A)(1) and 9(B)(6)(g) ("[T]he exhibits admitted at trial are part of the transcript of proceedings."). Accordingly, our analysis is based on the full evidentiary record, inclusive of all trial exhibits.

**{¶27}** We further note the challenges under each issue presented for review as to whether 2900's complaint was sufficient. The argument raised under the first issue presented for review is that the complaint does not adequately define the easement where no exact physical boundaries are provided in the complaint. However, no authority is cited in support of the assertion that the complaint must provide exact boundaries of the claimed easement. The argument raised under the second issue presented for review is that 2900 unlawfully expanded the scope of the claimed easement beyond that which was presented in the complaint by including the parallel parking spaces at trial. Paragraph three of the complaint is relied on in support of this argument, which states, "Plaintiff must access Defendant's Property to enter, park, and exit Plaintiff's Property." However, the argument does not address paragraph 8, which states, "Plaintiff and predecessors in interest have used Defendant's Property for access to and from Plaintiff's Property *and for parking* since at least 1990, approximately 33 years." (Emphasis added.) This assertion was sufficient to provide notice of the extent of 2900's claim. *See Cline v. Rogers Farm Ents., LLC*, 2017-Ohio-1379, ¶ 46 (4th Dist.), quoting *Patrick v. Wertman*, 113 Ohio App.3d 713, 716 (3d Dist. 1996) (""'All that the civil rules require is a short, plain statement of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it is based.'"") Beyond that, these issues were not raised below. *See id.* at ¶ 47, quoting *Schade v. Quarterman*, 2014-Ohio-4034, ¶ 15 ("It is a rule of appellate procedure that 'an appellate court will not consider any error which could have been brought to the

13

trial court's attention, and hence avoided or otherwise corrected.'"). Therefore, we decline to find error based on the complaint.

### D. First Issue Presented for Review

**{¶28}** In the first issue presented for review, Jebril asserts that the trial court erred when it granted a prescriptive easement without further defining the physical boundaries of the easement as to the curb cut and the ingress/egress pathway to get to the bakery parking. In doing so, Jebril makes two arguments: (1) the evidence presented by 2900 failed to adequately describe the area sought for this purpose, and (2) that the trial court's entry is inadequate to describe the boundaries of the easement in this regard.

**{¶29}** As to the sufficiency argument regarding the evidentiary record, it is asserted that "[n]owhere in the record is there a clear representation of what [2900 seeks]." It is further claimed that "[w]ithin the hearing, there is likewise absolute zero reference to the specifics of the scope of the alleged easement, including any surveys, legal descriptions, site plans, or even a single discussion of what is at issue." However, these arguments are refuted upon review of joint exhibit XI and Member A's testimony regarding this survey map. At the start of trial, Member A testified that the area in pink on the survey map was the area over which 2900 was claiming an easement.

**{¶30}** An argument is also presented that there is "a considerable degree of drive aisle width" and therefore, even if an easement is warranted, "how the pathway looks must be defined" and "the pathway and shape and dimensions of it must all meet the five elements of a prescriptive easement." However, as indicated above, Member A established the area in pink as the area over which they were claiming an easement, and his remaining testimony, as well as the testimony of the other witnesses, established how this area has been used by bakery since 1990. Notably, this assertion

was never negated at trial in any manner. No evidence was offered in opposition to the asserted scope of the easement and no argument was made to the trial court regarding the scope of the easement. Instead, only a sufficiency argument was made in the written closing argument pertaining to the adversity element and the 21-year period.[1] Because no argument was made to the trial court regarding the appropriateness of the scope of the easement sought, we decline to consider this argument. *See, e.g., State v. Wintermeyer*, 2019-Ohio-5156, ¶ 10 ("A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below.").

**{¶31}** Nevertheless, even if we consider this argument, the evidence in the record does not support the assertion that there was a "considerable degree of drive aisle width." Rather, the evidence established that the left side of the pink area was used for parallel parking, and the area between that parallel-parking area and the bakery parking was used to reach the parking on either side. Joint exhibit XII—the overview photograph of the disputed area—shows that the in-between area is not much wider than the length of a car, and no contrary evidence was presented at trial to show that a narrower easement was—or could be—used by the bakery to reach the parking spots.

**{¶32}** Jebril nevertheless points to *Attewell v. Eagle Beach–Wildwood Assn.*, 2000 Ohio App. LEXIS 1887, *6 (6th Dist. May 5, 2000), in support of her argument. In *Attewell*, the court affirmed the trial court's dismissal of a claim for a prescriptive easement where the record lacked clear and convincing evidence setting forth the extent of the easement. *Id.* at *7. Instead, the evidence showed that "at scattered times

---

[1] Beyond that, she only made an argument challenging the appropriateness of the claim under the Declaratory Judgment Act. Notably, none of these arguments are now advanced before this court.

the disputed area was used for different activities and different purposes," with no evidence showing the exact location of these activities. *Id.* Further, the photographs submitted "lacked exact reference points from which the court could determine the exact area sought." *Id.*

**{¶33}** The same deficiencies do not exist here. Here, 2900 presented a survey map with the exact location of the area sought and presented testimony and an additional photograph of the area exhibiting how each part of this area was used, consistently, while the bakery was in operation since 1990. While it is true that the testimony indicates that the delivery trucks were parked in the parallel-parking area only sometimes, there was also testimony that the parallel-parking area was used for customer parking as well, and the bakery was open to customers six days a week. Most notably, Employee A testified that she worked at the bakery from 1993 to 2017, and that customers parked in the parallel-parking area during that time. Employee C testified that he worked at the bakery from 1992 to 2008 and said that he saw cars and trucks parked in the parallel-parking area during his "entire time there." Employee B testified that he was employed by Giminetti from 2008 to 2014 and again from 2019 to 2020 and said that he painted the stripes for the parallel-parking area in 2009 and 2011. Beyond that, the testimony of Member A and Employees A, B, and C also established that the curb cut and middle area was used every day for customers and employees to access and park at the available parking. When looking at the photograph of the middle area, the area appears to be only as wide as the length of a vehicle and the parking goes all the way to the back of the area sought. Thus, it is unclear how a car could use parking toward the back without utilizing the full middle area.

**{¶34}** Therefore, to the extent that this is a sufficiency argument, the argument

is overruled. Further, as pointed out by Jebril, courts have held that, because prescriptive easements are an equitable remedy, determination of the limits of a prescriptive easement is vested within the considerable discretion of the trial court and will not be reversed absent an abuse of discretion. *See, e.g., Pinkerton*, 2015-Ohio-377, at ¶ 19 (4th Dist.), citing *Dunn v. Ransom*, 2013-Ohio-5116, ¶ 9 (4th Dist.). Here, we cannot determine that the trial court abused its discretion in granting an easement over the full area requested as the evidence does not indicate that only a narrower easement was warranted, and no argument was made to the trial court regarding the scope of the easement. Therefore, to the extent that this argument is a challenge to the determination of the limits of the easement, the argument is overruled.

**{¶35}** Jebril further argues that the trial court's entry was inadequate to describe the boundaries of the easement.

**{¶36}** In *Ford v. Estate of Tonti,* 1992 Ohio App. LEXIS 6094 (10th Dist. Nov. 24, 1992), the court said, "A judgment entry describing an easement does not need to contain a metes and bounds description, so long as the description is sufficient to show the location of the easement." *Id.* at *39-40. This principle arose from the court's analysis of what would be needed in a judgment entry to "give notice to all the world that an easement exists for purposes of the use" at issue, considering that judgment entries may be recorded in the chain of title. *Id.* at *39. The court went on to hold that the judgment entry at issue was sufficient to identify the implied easement where the entry "referred to the attached survey drawings in indicating the parameters of the easements granted to the appellants," and indicated the approximate area that the appellants were permitted to use. *Id.* at *40.

**{¶37}** Jebril asserts that the trial court's use of the term "property at issue" in

17

the entry is insufficient as "the property at issue" was at no point defined by 2900.

**{¶38}** First, as mentioned above, the "property at issue" was defined by 2900 in joint exhibit XI and the corresponding testimony. Consequently, it is clear that the trial court's use of the phrase "property at issue" or property "subject to this lawsuit" was referencing the area that 2900 identified as the property over which it sought the easement. Nevertheless, the trial court did not reference or incorporate this exhibit, or the testimony about this exhibit, into its entry. Rather, the court simply describes the "property at issue" as "a piece" of Jebril's property. To ensure a sufficient description of the location of the easement, we sustain the assignment of error, in part, as to the description of the easement in the trial court's entry. We remand the cause for the trial court to provide a sufficient description of the easement, such as by incorporating joint exhibit XI into its judgment entry.

### E. Second Issue Presented for Review

**{¶39}** In the second issue presented for review, Jebril challenges the sufficiency of the evidence pertaining to the court's grant of the easement for the parallel parking.

**{¶40}** The argument raised is that, like in *Grace v. Koch*, 1996 Ohio App. LEXIS 4432 (1st Dist. Oct. 9, 1996), the alleged use of Jebril's property for parking was insufficient to create a prescriptive easement. In *Grace*, this court reversed an adverse-possession judgment for a number of different reasons, including failure to meet the burden of proof regarding the exclusive, hostile, and notorious elements of a claim for adverse possession. *See id*. at *32. Jebril appears to rely on the analysis pertaining to evidence of a notorious, hostile use of the land. *See id*. at *30-31. This court first said the notorious-possession element requires that

"the adverse claim of ownership must be evidenced by conduct

18

sufficient to put a person of ordinary prudence on notice of the fact that the land in question is held by the claimant as his own. The possession must be visible and open to the common observer of the property so that the owner or his agent, on visiting the premises, might readily see that the owner's rights are being invaded."

*Id.* at *29-30, quoting *Jennewine v. Heinig*, 1995 Ohio App. LEXIS 5816 (2d Dist. Dec. 29, 1995). This court then stated,

The [claimants] planted a tree, erected a swingset, parked cars and trucks, stored firewood and materials, and constructed a carport on the strip. The relevant uses that would put [the title owner] on notice of adverse possession under Ohio case law are the tree and the carport, and these are very minor encroachments. The tree was planted in 1986 and the carport was erected in 1983. Neither of these were within the twenty-one-year statute of limitations. Therefore, until 1983, no use by the [claimants] was sufficiently notorious to put [the title owner] on notice that they claimed to adversely possess the strip.

*Id.* at *31.

**{¶41}** However, it is important to view this holding within the context of the entire case, wherein it was established—among other things—that the strip of land in question was used by both parties during the statutory period, the swingset was erected but subsequently removed, and cars and trucks were only parked on the land "periodically." *Id.* at *6, 22, 25-26. Thus, these uses—within the facts of the specific case—were not "sufficiently notorious to put [the title owner] on notice that [the claimants] claimed to adversely possess the strip," i.e., the uses were not sufficient to "put a person of ordinary prudence on notice of the fact that the land in question is

19

held by the claimant as his own." *See id.* at *30-31.

**{¶42}** This court's holding was affirmed by the Ohio Supreme Court in *Grace v. Koch*, 81 Ohio St.3d 577 (1998). The court said,

> [The title owner] first took action to assert ownership in July 1992 when [one claimant] began spreading gravel over the strip and [the title owner] attempted to stop him. Therefore, to establish adverse possession, the [claimants] must prove by clear and convincing evidence that each element of adverse possession had been established since 1971. We find it unnecessary to address each of the elements of adverse possession because the [claimants] did not establish by clear and convincing evidence that they held the strip adversely to [the title owner] for the entire statutory period.
>
> This court has stated that "it is the visible and adverse possession with an intent to possess that constitutes [the occupancy's] adverse character," *Humphries v. Huffman* (1878), 33 Ohio St. 395, 402, and that "the occupancy must be such as to give notice to the real owner of the extent of the adverse claim." *Id.* at 404. In *Lane v. Kennedy* (1861), 13 Ohio St. 42, this court stated that to make possession adverse, "there must have been an intention on the part of the person in possession to *claim title, so manifested* by his declarations or his acts, that a failure of the owner to prosecute within the time limited, raises a presumption of an extinguishment or a surrender of his claim," (Emphasis *sic*.) *Id.* at 47.
>
> The Vermont Supreme Court stated the same proposition more colorfully when it declared that to establish adversity, "the tenant must

20

unfurl his flag on the land, and keep it flying so that the owner may see, if he will, that an enemy has invaded his dominions and planted his standard of conquest." *Darling v. Ennis* (1980), 138 Vt. 311, 313, 415 A.2d 228, 230. See, also, *Philbin v. Carr* (1920), 75 Ind. App. 560, 591, 129 N.E. 19, 30.

There is no question that the [claimants] used the strip. They mowed the grass, parked cars in the strip, and their children played in the strip. The [claimants] also placed firewood, oil drums, and a swing set in the strip. While we consider the case a close one, we conclude that the record does not contain clear and convincing evidence that [title owner] or his parents were on notice that their dominions had been invaded in 1971. The [claimants] asked for the [title owners]' permission before proceeding to mow the strip. [One claimant] conceded that he knew that the strip belonged to [title owner] and that he never would have used it without permission. Absent clear and convincing evidence of the adversity of the [claimants]' claim to the strip for the entire statutory period, adverse possession must fail.

*Id.* at 581-582.

**{¶43}** Here, no argument is advanced that the use of the parallel-parking area was not adverse. Rather, it is argued that the evidence is insufficient to show open and notorious use of the area for parallel parking for 21 years. However, as mentioned above, Employees A, B, and C testified that customers parked in the parallel-parking area during the terms of their employment with Giminetti. The evidence indicates that the bakery was open to customers six days a week. Additionally, Member A's testimony indicates the disputed strip was used for parking "every day" while the

bakery was in operation since 1990. Further, the evidence indicates that the use of this area was not hidden or done with permission by the title owner. Significantly, no evidence was offered to the contrary to rebut the assertion that the bakery used this area for parallel parking notoriously, continuously, and without permission for the required 21-year period. In the absence of any evidence to the contrary, the evidence was sufficient to show notorious use of the property for parallel parking. Consequently, this argument is overruled.

## *IV. Conclusion*

{¶44} For all the foregoing reasons, we sustain the sole assignment of error in part as to the trial court's insufficient description of the easement in its judgment entry and overrule it in part as to the remaining arguments under the assignment of error pertaining to the evidence establishing the easement. Accordingly, the trial court's judgment is affirmed as to the granting of a prescriptive easement and reversed insofar as the description of that easement in the judgment entry, and the cause is remanded for the trial court to provide a sufficient description of the easement.

Judgment affirmed in part, reversed in part, and cause remanded.

**KINSLEY, P.J.,** and **NESTOR, J.,** concur.